LittletoN, Judge,
delivered the opinion of the court:
Plaintiff[1] sues to recover an alleged loss sustained in the performance of a construction contract with the defendant. The petition is in two counts. Count I seeks recovery under the War Contract Hardship Claims Act,[2] also known as the Lucas Act, and Count II is a claim for breach of contract.
Under this contract, which was a lump sum contract entered into with the U. S. Army Corps of Engineers in June 1943, plaintiff was to construct within a period of 61 days an addition or enlargement to the existing water treatment facilities at Camp Gruber, Oklahoma. Defendant was to furnish virtually all of the cast-iron pipe, specials, fittings and valves required in the work. Plaintiff claims that defendant’s delay in furnishing certain of these materials delayed and interfered with the orderly progress of the work upon which plaintiff’s bid was based, thereby causing the work to be done in disorderly sequence and requiring 71 days’ additional time at an increased cost of $88,390.33.
*560 COUNT I
Upon the close of plaintiff’s proof relative to Count I, defendant moved pursuant to Rule 49 (b)[3] for a dismissal of that count on the grounds, inter alia, that plaintiff had never made a valid request for relief under the Lucas Act. The commissioner of this court made detailed findings of fact and filed a report recommending that defendant’s motion be granted. On the basis of those findings (findings 2 to 7) and our review of the record, we accept the recommendation of the commissioner and dismiss plaintiff’s claims under Count I of the petition on the ground that plaintiff had never filed with the appropriate department a valid request for relief under the Lucas Act. Throughout all negotiations, plaintiff believed and asserted that the Government, as of right, owed her the amounts claimed. Recovery under the Lucas Act requires that the written request for relief must be such as to apprise the Government that the claim being made was one for extra legal relief outside of any contractual obligation. Fogarty v. United States, 340 U. S. 8; Lawrance Aeronautical Corp. v. United States, No. 48942, decided November 3, 1953. Plaintiff has not met that requirement.
count n
Under Count II of the petition, plaintiff seeks recovery for breach of contract.
The enlargement of the water treatment facilities at Camp Gruber was authorized by the Chief of Enginers on May 14, 1943. The specifications were dated June 2,1943, and plaintiff was advised of the acceptance of its bid by letter of June 16,1943, accepted by plaintiff on June 17,1943. The specifications required that work be commenced within one calender day after receipt of notice of award and be completed on or before August 17, 1943. Since plaintiff accepted the award on June 17, it provided for 61 calendar days for completion of the work. The notice of award was the notice to proceed as well. The work as far as plaintiff was concerned *561 was completed on October 27, 1943, which was a delay in completion of 71 days.
Plaintiff was paid $38,765.58 which consisted of the contract price of $35,210, changes amounting to $55.25 (finding 20), additional cement over that specified in the sum of $341.88 (finding 26) and $3,158.72 for additional work done in correcting leakage of existing structures. (Finding 30.) The total cost to plaintiff under the contract was $77,156.18 (finding 33) which resulted in a loss of $38,390.33, representing the excess cost of performance by reason of delays in the delivery of materials. In addition to asking recovery of this amount, plaintiff also claimed $1,394.83 as representing additional costs entailed in performing alleged extra work. The facts as found by the commissioner of this court do not support these latter claims, and plaintiff has taken no exception to those findings. (Findings 31 and 35.) Therefore, the only loss with which we are now concerned is that which plaintiff alleges was caused by delays of defendant in the delivery of materials.
This contract called for the construction of a settling basin and filter house which were to be added to the already operating water purification system at the camp. Of the two structures, the filter house was the more complex, requiring three floors with installations for the purification of water, a gallery of cast-iron piping running through the floors and connections with adjacent filter structures. It is not disputed that the sole cause of the 71-day delay was the late delivery of materials needed in the construction of the filter house. The settling basin was substantially completed within the contract period. Practically all the material for the filter house was to be furnished by the defendant.
Plaintiff contends, and there is some evidence, that the failure of the Government to effect timely delivery of these materials was responsible for the entire 71-day delay. This, plaintiff alleges amounted to a breach of contract on the part of the defendant, making it liable for the full amount of the loss sustained.
Defendant while admitting that plaintiff sustained a loss of $38,390.33 asserts that, since no negligence on its part has been shown, it cannot be held liable for any part of the loss. *562 Defendant argues that in any event it was responsible for only 14 or 15 days of the delay resulting from the late arrival of materials that it was required to supply, and it further contends that, even assuming liability on its part for causing a particular number of days of delay, plaintiff is still not entitled to recover because of the impossibility of apportioning the amount of the resulting loss between delays chargeable to the Government and those not chargeable to it. We have uniformly held that where the defendant causes delay we will not undertake to apportion the delay unless the evidence is clear.
In setting up this work, plaintiff planned a method of operation which was proper and reasonable, wherein the construction of both settling basin and filter house would proceed simultaneously making use of the same work crews. This method saved expense and was reasonable and proper. Plaintiff intended to alternate the different trades from one building to the other as the need required. Thus, most of the workers could be kept on the job continuously until their ultimate release. The construction of both structures simultaneously, with the workers being shifted from one to the other, was the only possible procedure which could be followed if all work was to be completed within the time required by the contract, and was obviously contemplated by the parties and by the contract. In order to follow this procedure it was necessary that the pipe and related items needed for the filter house, which were to be supplied by defendant, be on hand as the work progressed. In fact, no substantial work could be accomplished at all in connection with the filter house without having the pipe on hand. The installation of this piping was unlike that encountered in the building trade generally, where the plumbing and heating pipes could be provided by merely inserting sleeves through the concrete walls for the placing of the pipes at a later time. Here the filter house was to be watertight in all respects, necessitating the actual installation of the pipes through the wall areas before the concrete could be poured, so that as tight a seal as possible could be achieved. The defendant’s engineer knew this, and allowed no deviation from that procedure.
*563 Generally, even though, the Government may fail for justifiable reasons, to secure timely delivery of materials which under a construction contract it is required to furnish, no liability for resulting delays will attach, unless it can be found that its representatives were at fault. United States v. Foley, 329 U. S. 64; Barling v. United States, No. 49190., decided May 5, 1953; Cf. Torres v. United States, No. 48949, decided June 2,1953. We think there was fault on the part of defendant in this case.
There is present, in a contract such as this one, an implied obligation on the defendant that it will not do that which will hinder the contractor in the performance of the contract. When the contractor is delayed by a negligent act chargeable to the Government, it is a breach of this clearly implied obligation, and the Govermnent is liable for the damages sustained by the contractor because of the delay. Fuller v. United States, 108 C. Cls. 70; Kehm Corporation v. United States, 119 C. Cls. 454; Cf. J. J. Kelly Co. v. United States, 107 C. Cls. 594. In the absence of evidence to the contrary, when one party agrees to furnish particular materials to be used by the other, he must be held to have agreed “to furnish them in time to be installed in the ordinary and economical course of the performance of the contract.” Walsh v. United States, 121 C. Cls. 546, 554-555. Defendant is guilty of just such a breach here. Its officials were negligent, not only in failing to use due diligence in expediting delivery of materials once the work had begun, but in their failure to place their purchase orders so as to permit timely delivery. Unlike the Barling case, supra, here it has been shown that the defendant knew prior to giving plaintiff notice to proceed that it would be impossible to secure delivery of the necessary pipe and fittings in time to enable the work to proceed in an orderly manner. The facts clearly show this. Procurement officials knew that delivery could not be made until a date which would make completion within the required time impossible. They failed without cause to act in this regard with reasonable promptness. Possessed of such knowledge, it was a breach of contract on the part of the defendant to give plaintiff notice to proceed requiring her to begin one day after notice and to complete work on August 17, knowing that the *564 necessary pipe and fittings needed in the filter house would not begin to be delivered by suppliers until the end of the first week in August. Purchase orders for a few items were placed on June 14, but most of the heavy piping required for the filter house was not ordered until June 19. Some of the orders for the piping materials were placed as late as the first of August, with delivery being made in late September. It must be pointed out that from the supplier’s standpoint there was no delay in the delivery of the pipe and fittings since the Government was given delivery on the dates promised. The fault was that of the defendant. All efforts at expediting that transpired during the progress of the work were not caused by any default on the part of the supplier but were efforts to effect delivery prior to the promised dates. Under these circumstances we are of opinion that the defendant is liable for that portion of the loss sustained because of the late delivery of Government-furnished materials.
While no dispute now exists between the parties as to the total number of 71 days of delay or as to the amount of the loss, $38,390.83, the parties do differ on what portion of the total delay they believe chargeable to each other.
Although plaintiff received the notice of award on June 17 requiring the work to be commenced within one day, the work was actually begun on the 16th, and the work remained close to schedule through mid-July at which time excavation for the filter house had been completed. Plaintiff was then prepared to pour the concrete foundation, but was unable to do this until August 11, when the 16-inch cast-iron drainage piping, which the defendant supplied, was received. Work then progressed until September 4, although delay was encountered during this period because certain cast-iron specials furnished by the plaintiff were not delivered by suppliers until August 26. On September 4 work stopped completely because of the lack of materials which the defendant was required to furnish, and which materials were required to be placed in the wall concrete. (Finding 16.) On September 11 work commenced again and continued through until completion on October 27,1943. Delays during this latter period were entailed because of the delay in *565 delivery of other materials the defendant was required to furnish which did not arrive until the latter part of September (finding 16) and because of plaintiff’s difficulty in obtaining bricklayers. (Finding 20.)
Plaintiff charges the Government with responsibility for the entire period of delay and asks recovery of the full amount of the loss, while defendant accepts responsibility for only 14 or 15 days of the delay, and denies the right of recovery of any amount by plaintiff on the grounds that just what amount of the total loss those 14 or 15 days were responsible for is impossible to determine.
The defendant cannot in the circumstances of this case be charged with the full responsibility for the entire 71-day delay, as plaintiff alleges. As mentioned above, progress was hampered during periods when both parties were at fault. Nor can the defendant’s breakdown of 14 or 15 days be accepted. It would be impossible to assign particular days of delay to one of the two categories, Government’s fault or concurrent, as defendant has attempted to do. This is so because much of the work overlapped, and there was only one period when all work stopped completely. However, we do not believe that this difficulty should operate to bar plaintiff from all recovery. Upon a consideration of all the evidence, the commissioner of this court found that a reasonably accurate computation of the delay, wholly chargeable to the defendant as a result of the failure, without justifiable cause, to perfect timely delivery of materials can be made, and on that basis, he has found that defendant was responsible for one-half of the 71-day delay in the completion of the contract work. This finding is fully supported by the record. The commissioner likewise found that the excess cost to plaintiff resulting from delays in deliveries of materials which the Government was required to furnish was $19,195.16, one-half of the total loss of $38,390.33. Defendant has excepted to both these findings on the basis that it is impossible to set aside 35% specific days of delay as chargeable to it, and assuming, arguendo, that such a designation could be made, then it remains impossible to apportion any fraction of the total- loss between concurrent delays chargeable to both parties and those chargeable to the Gov *566 ernment alone. We find these exceptions to be without merit.
In regard to this question of the difficulty in arriving at precise determinations in assessing damages, this court in Needles v. United States, 101 C. Cls. 535, 618, stated as follows:
* * * Absolute certainty as to the amount of damage is not essential, this being a matter for determination according to the circumstances of each case. There is no objection to damages that they are difficult to ascertain, depending upon contingent and uncertain events, for in all actions for damages for breach of contract the foundation or underlying principle is full compensation for the wrong done. * * *
Although the proof may not be so positive as to enable the court to make an absolute determination of the precise excess costs resulting from delays chargeable to one party, an approximate and reasonable allowance on the basis of all the facts and circumstances may be made. See Fuller v. United States, 105 C. Cls. 248. The rule which precludes recovery because of uncertain or speculative damages, upon which defendant relies, has no application here. That rule applies only to situations where the fact of damage is itself uncertain. Here the fact of damage suffered by plaintiff is certain. It is enough under these circumstances if there is a basis for a reasoned inference as to the extent of the damage chargeable to one of the parties. Anderson v. Mt. Clemens Pottery Co., 328 U. S. 680, 688; Eastman Kodak Co. v. Southern Photo Co., 273 U. S. 359, 377-379.
On the basis of these principles which we hold to be applicable to the situation here, and upon a review of the whole record in the light of the commissioner’s findings and the parties’ exceptions thereto, we affirm and adopt those findings (findings 21 and 36) as being reasonable and supportable calculations as to the amount of delay and resulting damages chargeable to the defendant.
Plaintiff’s petition as to Count I is dismissed. Judgment is entered for plaintiff on Count II in the amount of $19,195.16.
It is so ordered.
MaddeN, Judge; Whitaker, Judge; and JoNES, Chief Judge, concur.
*567 FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. Under date of June 16, 1943, the plaintiff, a resident of Springfield, Missouri, doing business as Chalender Construction Company, entered into a contract, No. W-957-eng-1941, with the defendant, acting through the Corps of Engineers, for the enlargement of the water treatment plant at Camp Gruber, Oklahoma, for the lump .sum contract price of $35,210. The plaintiff has joined in the petition two purported causes of action designated as Count I and Count II. In Count I recovery is sought pursuant to Section 6, Public Law 657, Chap. 864,79th Cong., 2d Sess., amended by Public Law 773, Chap. 646, 80th Cong., 2d Sess., commonly known as the Lucas Act. Count II is a contract claim in the alternative.
COUNT i
2. Article 4 of the contract read as follows:
Changed Conditions. — Should the Contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the Contracting Officer shall be called immediately to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall with the written approval of the Secretary of War or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
*568 Article 15 of the contract read as follows:
Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor at his address shown herein. Within 30 days from said mailing the Contractor may appeal in writing to the Secretary of War, whose written decision or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto. * * *
3. On November 18, Í943, when the work was practically complete, the plaintiff wrote the Area Engineer stating that a loss of between $35,000 and $40,000 had been incurred, and stated:
* * * We have found a number of things that we encountered on this project which was not our fault and we should be paid for.
Because of the above facts we think this contract should be renegotiated between the Gov’t and us. * * *
The Area Engineer replied under date of November 20, 1943, acknowledging receipt of plaintiff’s letter of November 18,1943, and stating:
Since this office has no authority to handle matters of this kind, it has been referred to higher authority. You will be notified as soon as a course of action is determined.
On November 29,1943, the Area Engineer, with reference to plaintiff’s letter of November 18,1943, advised:
In paragraph 3 of your letter you state, “We have found a number of things that we encountered on this project which was not our fault and we should be paid for.”
It is requested that your claim for the items ref erred' to be submitted to this office as soon as possible. This should be in the form of an itemized account showing in detail all expenses incurred and accompanied by sufficient explanation to justify your claim.
Thereafter, on January 7, 1944, the plaintiff wrote to the Area Engineer setting out the fact that the plaintiff had lost money because of the failure of the Government to furnish *569 materials on time, because of certain changed conditions, because of the refusal of the Government to permit the plaintiff to lower water elevations while performing certain aspects of the work, because of unreasonable inspection, and because the plaintiff was required to use more cement in the concrete than was required by the specifications. This letter was supplemented by a letter dated March 25,1944.
4. On April 21,1944, the District Engineer and contracting officer replied to plaintiff’s letters of January 7, 1944, and March 25, 1944, and denied all of plaintiff’s claims except that of placing more cement in the concrete than was required. This claim was allowed by the contracting officer.
The plaintiff thereafter took an appeal to the Secretary of War from those portions of its claim which were denied and on June 15,1944, sent a letter discussing various portions of its claim.
5. The War Department Board of Contract Appeals in its decision on December 29,1944, noted that, of the eight claims originally filed, Claims 1 and 7, which related respectively to additional costs caused by late delivery of materials to be furnished by the Government and to unusually rigid inspection, had been withdrawn and that Claim 8, as originally filed, had been paid by the contracting officer. Of the five remaining claims the Board of Contract Appeals sustained the plaintiff as to three claims based on changed conditions and allowed these. It denied the two remaining claims, one of which was made on account of a claimed changed condition and the other because of the Government’s refusal to permit the plaintiff to lower water elevations while conducting contract operations.
6. In presenting the claims to the Government, the plaintiff believed that the Government owed it the amounts claimed as a matter of right. The letters written by the plaintiff to the defendant were not sufficient to put the Corps of Engineers on notice that it was being asked to grant extra-legal relief under the First War Powers Act. The plaintiff’s claims were construed as being based on Article 4 of the contract and were decided as contract claims. There is no showing nor is it alleged that this decision was fraudulent or so grossly erroneous as to imply bad faith.
*570 7. Upon the close of the plaintiff’s proof under Count I, the defendant moved for a dismissal of this Count under Rule 49 (c) (3) of the Court. Pursuant to authority of this Rule, the Commissioner of this court filed a report recommending that the motion of the defendant be allowed and Count I of the petition be dismissed upon the grounds that, on the facts and the law, the plaintiff has shown no right to recover.
COUNT II
' 8. Under Count 2 the plaintiff claims $40,373.90, consisting of alleged increased costs of $38,979.07 by reason of delays in deliveries of materials furnished by the Government, $139.97 additional labor costs resulting from leakage of existing structures, $746.22 additional labor costs because of unreasonably rigid inspection and $508.64, representing the cost of watertight bulkheads installed in the existing settling basin so that connection cuts could be made in the wall without lowering the water therein.
9. The contract states in part:
This contract is authorized by the following laws: Statutory Authority: Title II of the First War Powers Act, 1941, Act of December 18,1941 (Public Law 354— 77th Cong.), and Executive Order No. 9001, dated December 27,1941.
The pertinent provisions of the contract are annexed to the petition. They provide that all work should be done in accordance with plans and specifications prepared by the defendant. The provisions of the contract are those of the standard Government construction contract with Article 3 on Changes, Article 4 on Changed Conditions, Article 5 on Extras, Article 9 on Delays-Damages, and Article 15 on Disputes. (Finding 2.)
10. The general provisions of the specifications provided in part:
1-34. Materials {Other Than Lumber) To Be Furnished by the Government.
(a) Scope. — Notwithstanding the requirements contained in the “Technical Provisions” of these specifications, the items of equipment shown in the following subparagraphs will be furnished to the contractor f. o. b. the railhead nearest the site of the work and shall be *571 unloaded, transported to the building site and installed by the contractor. Payment for installing the materials and equipment will be made at the contract unit prices applicable thereto, or where no separate item for installation is shown, shall be included in the contract unit or lump-sum price for the item of which the equipment becomes a part. The contractor will be responsible for any demurrage charges incurred.
(1) All cast-iron pipe, valves and fittings (except 12-inch cast-iron specials and flanges connecting clear water wells; and the manifolds beneath the filters).
(2) All V. C. pipe, specials and fittings.
(3) Vent pipe and pipe supports.
(4) Calking lead.
(5) Jute packing.
(6) Loss-of-head and rate-of-flow gage.
(7) Kate-of-fiow controller.
(8Í Valve stands equipped with indicators.
(9) Cannon stoves.
(10) Dresser couplings.
(11) Interior electrical conductors.
(12) Electric light bulbs.
(13) Nails as required.
All lumber necessary for the construction of concrete forms and other installations was furnished by the defendant and obtained largely from available supplies in Government stockpiles.
11. The specifications required that work be commenced within one calendar day after the receipt of notice of award and that all work be completed on or before August 17,1943. The notice of award was issued June 16, 1943, and accepted by the plaintiff on June 17,1943, providing 61 calendar days for completion of the contract.
The specifications also required the contractor to work 24 hours a day, 7 days a week, including holidays, when, in the opinion of the contracting ofiicer, such action was necessary to complete the work on schedule.
Paragraph 1-05 (c) of the specifications provided that, should the delivery of materials or supplies essential to the completion of the contract be delayed by reason of war priorities and without the fault or negligence of the contractor, the contractor would not be penalized by failure to complete the work, of which such materials were a part, within the time specified, but would be required to complete all other *572 work which, in the opinion-of the contracting officer, was not delayed because of war priorities. Paragraph 1-05 (d) provided that the contractor would not be required to pay liquidated damages for failure to complete the work within the stipulated time limits.
The pipes, valves and fittings required for installation of this job carried a priority rating of AA-S, whereas similar materials for Navy work were given a priority rating of AAA.
The contract work was finally completed October 27,1943, except for the installation of a loss-of-head and rate-of-flow gage which was to be furnished by the Government. Arrangements were made to have the post engineer install this unit upon its receipt.
12. The principal work required under the contract was the construction of a settling basin and a filter house, as additions to similar existing structures. The settling basin was to be constructed with reinforced concrete having outside dimensions of 102 feet by 42 feet and an average depth of 13 feet, with influent and effluent weirs, cast-iron supply lines and sewer drain, and with connections to the adjacent existing settling basin.
The filter house was approximately 39 feet by 19 feet and 20 feet high. It was a more complex structure, having three floors and a roof, with installations for the purification of water and a gallery of cast-iron piping running through the floors, and connections with adjacent existing filter structures. The footings, floors and lower walls were to be constructed with reinforced concrete and the upper walls of brick.
The two additional structures were approximately 1,200 feet apart and became part of the existing water purification plant for Camp Gruber.
13. Paragraph 1-14 of the specifications required that the contractor submit a schedule, within seven days after the issuance of the notice to proceed, in the form of a progress chart of suitable scale to indicate the percentage of work scheduled for completion at any time. The plaintiff submitted a single-line curve upon a graphic sheet indicating the intended progress and completion within the contract period, *573 and a second line terminating about July 9,1943. The types of work are not indicated for the two lines.
The major classifications of work involved were excavation, reinforced concrete work and the installation of piping, valves and fittings. There is no evidence that the defendant objected to the form of progress chart submitted. The partial payment schedule was not itemized for estimating the performance completed upon the various classifications of work.
14. The plaintiff planned a sequence of operations so that construction of the main structures could be carried on simultaneously with the same crews. It was planned that the different trades would follow alternately from one structure to the other, as needs demanded, thereby maintaining a continuity of the work to the greatest extent possible, and in this manner most of the workers could be kept on the job continuously until their ultimate release.
Because of the complex nature of work on the filter house, the plaintiff planned to start work on this structure first. The pipes passing through the concrete work in this structure necessitated the installation of the pipes along with the concrete forms before any concrete could be poured. The comparatively small pours in this structure would be made as they were prepared by transferring the concrete crews from the settling basin where the greater portion of the concrete work was to be done. Then, as additional installations were ready, other pours would be made in like manner.
The construction of both structures simultaneously, using the concrete workers and other trades alternately on each structure, was the only possible procedure that could be followed to complete the work within the period specified and at the cost anticipated by both the G-overnment and the plaintiff. It necessarily required that the pipes, flanges, valves and fittings to be installed along with the concrete work would be on hand as the work progressed. The plaintiff planned its operations after this fashion. When defendant gave plaintiff notice to proceed at the time it did knowing that delivery of much of these materials could not be accomplished until August or later, it made adherence to this schedule impossible.
*574 Tbe installation of pipes in these structures was unlike that encountered in building construction, where the plumbing and heating pipes could be provided by merely inserting sleeves through the concrete walls for the installation of the pipes thereafter. These were watertight structures necessitating the actual installation of pipes through the wall areas and the forms before the concrete could be poured, so that they would be tightly sealed and become an integral part of the wall itself. The defendant’s engineer declined to allow any deviation from this procedure.
15. The Chalender Construction Company was operated by John W. Chalender, Jr. It performed numerous Government contracts during the war period. Because of the possibility of being called into the military service, and to avoid complications that might arise, these contracts were executed and entered into by his wife, Fern E. Chalender.
Mr. Chalender started the work on June 16,1943, with his carpenter foreman. The plaintiff’s superintendent, George I. Woner, arrived at the site on June 26 and continued until the job was completed. He was an excellent superintendent and worked amicably with the defendant’s representatives.
Mr. Earl E. Bowman, a plumbing and heating contractor of Springfield, Missouri, was a specialist in his line and had performed this type of work on practically all of the plaintiff’s contracts. He estimated the piping and sewerage installations for this job, and performed this work under the plaintiff’s contract upon a cost-plus agreement. Camp Gruber, where the job was located, was approximately 240 miles from Springfield, Missouri.
Colonel F. J. Wilson- the District Engineer at Tulsa, Oklahoma, was the contracting officer. He was represented by Captain Lee Sorey, the Area Engineer at Camp Gruber. Mr. Balph W. Delaney was the resident engineer and inspector of the work and remained on the job until October 4, 1943. The construction site was approximately three or four miles outside of the camp.
MATERIALS
16. Substantially all of the metal piping furnished by the Government was required for installation in the filter struc *575 ture. The principal installation of this type in the settling basin was a 12-inch, cast-iron sewer line, 50 feet long. This was received and installed by the plaintiff’s subcontractor on July 13,1943.
The enlargement of the water treatment plant at Camp Gruber was authorized by the Chief of Engineers on May 14, 1943. The specifications for this work were dated June 2,1943. The plaintiff was advised of its award by letter of June 16, 1943, pending the negotiation of a satisfactory contract prior to July 16, 1943. This letter of award was accepted by the plaintiff on June 17,1943.
The materials not available as surplus from other projects had to be acquired by purchases. Most of the piping and fittings were purchased. Prior to June 16,1943, defendant’s officials knew that prompt delivery of piping was impossible and that 45 days would be required thereafter for delivery of such material. The first purchase orders were issued on June 14, for a few items. Orders for most of the heavy piping were placed on June 19, 1943. The bulle of the remaining items was ordered during the latter part of June, July, and early August, 1943. A number of the smaller items were not purchased until the latter part of September 1943. All Government furnished piping material was delivered on the dates promised by the suppliers.
The 12-inch cast-iron pipe required for installation as a sewer line in the bottom as the settling basin was received at the camp about the end of June. The 30-inch V. C. bell-type piping for connecting the existing mixing basin with the new settling basin was received at the same time. Also, connections were required between the west side of the existing settling basin and the new structure. There is no evidence that any delay in the construction of the settling basin resulted from lack of material furnished by the defendant, and this structure was substantially completed by the end of the contract period.
Most of the heavy piping furnished by the defendant for the additional filter plant arrived at the camp about August 6 and was received by the contractor by August 10. However, the critical material requiring installation within the concrete walls was received in small lots thereafter. Most *576 of the plug valves and flanges, requiring installation in the concrete walls of the clear wells and pipe gallery, did not arrive until about September 10, and some units as late as September 23,1943.
The materials to be furnished by the Government were obtained by the procurement officer in the District Engineer’s office in Tulsa. He had no knowledge of the work involved on this job until the contract was let and did nothing to procure the materials until he received listings of the materials required. However, orders were usually placed for the materials within 24 to 36 hours after the bill of materials was received. Contacts with suppliers were thereafter made to expedite deliveries as promised by the supplier.
The defendant also employed an expediter of materials at the camp, who had regular contacts with the contractor and would follow up anticipated deliveries of the materials. The resident engineer also cooperated to the greatest extent possible in expediting the deliveries of the required materials. This expediting service was provided for the plaintiff’s materials as well as for materials famished by the Government.
17. The plaintiff was required to furnish the reinforcing steel for its concrete work. The plaintiff also had to furnish a 14-inch manifold, with openings for 21 three-inch laterals and 31 %-inch umbrella-type strainers for installation on the second floor of the filter house above the clear wells and immediately under the sand and gravel filter bed together with certain pressure plates and wash trough hangers.
The most important units to be furnished by the plaintiff were four 12-inch cast-iron specials, which were installed in the bottom of the walls of the clear wells in the filter structure. These 12-inch special units were inserted through the walls and fitted through the concrete forms before the concrete could be poured around them. They were provided with flanges that projected into the surrounding concrete to avoid seepage around these units. The last units did not arrive until August 26, 1943.
The E. W. Bacharach Company, which supplied the manifold, advised the defendant that this unit had been shipped on August 20, 1943, and that should the type of headers be *577 required as shown on the plan, it would be unable to supply them for several months. Upon receiving this advice the defendant authorized a substitute manifold shipped in order to avoid further delays, subject to satisfactory installation and operation of this unit. The manifold arrived on August 28,1943.
PEHEORMANCE
18. When the plaintiff’s superintendent arrived on the job on June 26, defendant’s resident engineer advised him that the 12-inch cast-iron pipe for the settlement basin would be available. By June 29 the plaintiff had substantial equipment on the job, including a concrete mixer, one small bulldozer, a six-cubic-yard scraper, and the power shovel arrived that evening. The working force consisted of 14 laborers, 9 carpenters, a truck driver and equipment operators.
Shovel excavation was started for the settling basin and the carpenters were engaged in constructing forms for both the settling basin and filter house concrete. Reinforcing steel began to arrive July 3. By July 9 the shovel excavation for the settling basin was completed. By July 15 the 12-inch cast-iron sewer drain had been installed in the settling basin, most of the reinforcing steel for the footings had been installed, and a substantial part of steel for the floor slab.
On July 21, the plaintiff started two shifts of eight hours each, employing 30 laborers and 13 carpenters in each shift, for the pouring of the walls for the settling basin. By the end of July this labor force was reduced to 11 laborers and 5 carpenters per shift because of lack of sufficient reinforcing steel. On August 3 the additional steel arrived and two shifts of ten hours each with a full quota of workers were again employed. The settling basin walls were completed about August 6 and the work force was reduced to one shift thereafter, performing work adjacent to the settling basin and some work on the filter structure.
19. During the excavation for the settling basin, leaks were discovered in the adjacent existing structure. On July 3 leakage occurred in the west wall of the existing settling basin. It was found that the water came through honeycombed areas of the concrete. The water was lowered and *578 the areas patched. Thereafter, other leaks occurred and by-July 15 the entire inside of the south wall of the adjacent settling basin had been plastered by the contractor. This appeared to stop further leakage in this area.
The contractor relocated two 2%-inch fire hydrants north of the new settling basin. One of these was set too low, and on July 5 the defendant’s inspector required it to be raised. On July 13 it was discovered that the trench for the 12-inch drain line for the settling basin was excavated too deep, and the contractor was required to place concrete bedding for this pipe for the proper gradient.
The contractor was required to cut into a section of the wall of the existing settling basin to provide connecting weirs approximately three by three feet in size. The resident engineer declined to lower the water in the existing basin longer than eight hours in any one period. The construction of this work required at least twice this period of time. The plaintiff was required to construct a watertight bulkhead inside the existing settling basin in order to make these connections. This work was started on July 11.
20. Shovel excavation was commenced for the additional filter structure immediately following the completion of rough excavation for the settling basin about July 9. By July 15 leakage was encountered around the existing filter. By July 17 excavation for this structure was 80 percent complete. The leakage was discovered to be coming from fractures in the existing 18-inch V. C. drain from the existing structure which traversed the foundation area for the new unit. It had been damaged in various places and merely covered with sheet metal when it was originally installed.
The plaintiff was required to replace this 18-inch clay tile piping with a 16-inch cast-iron drain pipe for that portion of the line under the new structure with a transition joint at a point beyond the foundation of the new structure, where the old 18-inch V. C. drainage line would continue to the existing manhole. Hand excavation for the footings of the filter unit could not be completed because of flooding of the excavated area, and the plaintiff employed pumps to dispose of the water. Work could not continue on the filter house until the old drainage line had been replaced.
*579 The 16-inch drain piping arrived at the camp on August 6 and was received by the contractor on August 10, 1948. It was placed on August 12. The night crew of August 14 cut into the clear well and installed the two 12-inch cast-iron specials. It appears from the drawings that one pair of the 12-inch cast-iron specials was employed for connecting the clear wells and one pair was provided with blind flanges and installed for future connections.
Thereafter, beginning on August 16, the plaintiff began placing the reinforcing steel for the floor of the clear wells. Forms for the lower sections of the walls were placed and some reinforcing steel was installed but no concrete could be poured until the pipes, flanges and fittings to be embodied in the wall were available.
The forms for the filter structure had been fabricated along with those required for the settling basin prior to the pouring of any concrete. They were completed about July 9, were stored in the open where they shrank and warped, and had to be rebuilt which required several days.
During the period up to September 10, 1943, when most of the wall fittings had arrived, the plaintiff was engaged in cutting out the south wall of the old structure adjacent to the new pipe chamber of the additional filter, performed some clean-up work and by the end of August had poured the footings and floor of the pipe gallery for the new structure. Wall forms and reinforcing steel had been placed as far as the work could be done and the plaintiff shut down entirely for the period from September 4 to September 10, 1943, because of the lack of needed materials that had to be placed in the wall concrete. During this period the plaintiff retained on the job three foremen, three carpenters and five laborers. On September 11,1943, the plaintiff resumed work and began the installation of fittings through the wall forms. On September 15 the plaintiff poured the lower part of the walls for the filter and pipe gallery. The additional materials arrived thereafter, and the top half of the filter structure was poured on September 26, 1943. The remaining work consisted of roofing the filter structure and painting a small amount of brick work on the top of the filter house. On October 2, 1943, the bricklayers came out but left the *580 job, allegedly because of a delay of one and one-half hours before they could start work, and despite the fact that the contractor was willing to pay them at the time and a half rate. On October 7 the contractor obtained one bricklayer who completed the work on October 11. The entire job was completed October 27,1948.
Only minor changes were made in the structures originally specified. Modification No. 1, dated July 28,1943, provided for the omission of eight-inch by eight-inch port holes in the effluent weir of the new settling basin' at no change in the contract price. Modification No. 2, dated October 12, 1943, provided for the installation of one window in the south wall of the extension to the existing filter house at the price of $17.55 and for an 18-inch steel vent pipe in the south wall of the new pipe gallery at the price of $37.70. No increase in the period of performance resulted from this additional work.
CAUSE OE DELAY
21. It does not appear that a great advantage would have accrued by starting the filter structure first, since the plaintiff had acquired an adequate supply of workers in the various trades within a short time after work was commenced to proceed with the larger structure, but it would have been necessary to retain these workers and shift the work from one structure to the other in order to complete the entire job within the contract period of 61 days. The normal work was disrupted and the job was delayed because of late deliveries of materials and failure to receive such materials in the order of sequence required for their installation into the filter structure.
The filter house was ready for the installation of its foundation footings about the middle of July 1943. This work could not proceed until about August 11 because of the delay in the delivery of the 16-inch cast-iron pipe which was installed for drainage under this structure.
The lower walls of the clear wells and pipe chamber could not be poured until after September 10 when fittings to be installed in these concrete walls were received. The 12-inch cast-iron specials furnished by the contractor were not delivered until August 26. They were installed through the *581 bottom of the walls of the clear wells before the concrete was poured. The last of the materials furnished by the defendant, requiring installation along with other work, did not arrive until almost a month later.
It is found that approximately one-half of the entire delay of 71 days in the completion of this contract was attributable to the delays in the receipt of materials furnished by the defendant concurrently with similar delays in the delivery of materials furnished by the plaintiff. One-half of the delay was attributable solely to the late deliveries of material furnished by the defendant.
INCREASED COSTS
22. The defendant’s resident engineer prevailed upon the plaintiff’s superintendent to maintain full crews to proceed vigorously with the additional work as materials would arrive. This continued from day to day in the hope and expectation that such materials would be received. The plaintiff’s superintendent retained substantially larger crews than the work required so that the plaintiff could proceed promptly as materials arrived, and in part by reason of difficulties in obtaining the various crafts at such times as they would be needed, and to avoid the training of new men in the particular type of work required on this job. The plaintiff employed skilled craftsmen, such as carpenters, on various types of common labor in order to keep them engaged on the job until they were required for their regular trades.
The plaintiff also had to retain equipment on the job during the periods of work interruption because of its need for later operations. The dragline was first employed for rough excavation of the structures, but was needed later for hoisting the heavy piping installed in the filter plant and for placing sand and gravel in the filter bed.
The plaintiff’s plumber was required to install the piping and fittings as they were received in order that other work could progress. He made- approximately eight separate trips to the job to complete the work at intervals as materials would arrive. On a few occasions he brought plumbers from Springfield, Missouri, to avoid any delay in obtaining workers from unions nearby.
*582 The methods whereby the plaintiff was obliged to perform the work were occasioned by the delays in deliveries of materials and greatly increased its costs in the performance of this contract.
23. On November 18, 1943, the plaintiff wrote the United States Area Engineer at Camp Gruber that it had sustained a loss on this job of between $35,000 and $40,000. This letter stated in part:
We are now going over the records of this project to determine the cause of this large loss. We have found a number of things that we encountered on this project which was not our fault and we should be paid for.
Because of the above facts we think this contract should be renegotiated between the Gov’t and us. We request a hearing by the Gov’t of our case. Will you please notify us by return mail when and where we can meet with the Gov’t officials to hear our case.
By letter of November 20, 1943, the plaintiff was advised by the Area Engineer :
Since this office has not authority to handle matters of this kind, it has been referred to. higher authority. You will be notified as soon as a course of action is determined.
By letter of November 29, 1943, the plaintiff was advised further by the Area Engineer:
It is requested that your claim for the items referred to be submitted to this office as soon as possible. This should be in the form of an itemized account showing in detail all expenses incurred and accompanied by sufficient explanation to justify your claim.
24. On January 7, 1944, the plaintiff wrote to the War Department through the U. S. Engineer’s office at Camp Gruber and set forth the reasons for its increased costs and losses in the performance of this contract. These reasons are summarized as follows :
(1) Failure of the defendant to furnish materials specified for installation in the work, as needed, so that performance could have been completed within the performance period specified.
(2) Leakage through the west wall of the existing settling basin into the adjacent excavation for the new *583 settling basin, and necessary patching of the old wall to stop such leakage.
(3) Leakage through the south walls of the two existing settling basins into plaintiff's excavation and construction of the effluent channel from the new settling basin.
(4) Increased cost of placing the 12-inch drainage line from the new settling basin to the manhole by reason of such leakage.
(5) Leakage into the excavation for the new filter unit through broken bells of the existing 18-inch V. C. drainage line, which line was later replaced by a new 16-inch cast-iron pipe after it was received some weeks later.
(6) The construction of watertight bulkheads in the old settling basin to make two cuts into this wall for connections with the new structure, by the refusal of defendant’s engineer to permit the lowering of the water for a sufficient period to perform this work.
(7) Unusually rigid inspection, requiring an unusual amount of supervision and the tearing out and replacing of work.
(8) More cement required in the concrete mix than that specified.
This letter stated in part:
It may be difficult to allocate the proportionate part of the additional expense against the individual items herein listed, but there can be no question that the cost of performing this contract was greatly increased by unforeseen conditions and circumstances which were entirely beyond our control.
A review of the proposals submitted in connection with this contract will prove that our original cost estimate and bid price was in line. The quality of the completed work is evidence that it was performed under capable and experienced supervision. The work was carried on as efficiently as possible under the circumstances and we made every effort to complete the project in a workmanlike manner and at no unnecessary expense or cost. Despite all sincere efforts on our part, we now find that our actual costs on this job, disregarding item whatsoever for profit, will exceed the contract price by $40,000.00 to $50,000.00 as can be verified by reference to form FAS-CD No. 6. This additional cost represents an unbearable loss to us and, since wé sincerely believe the additional costs were occasioned by circumstances as above outlined, we feel justified in respectfully *584 requesting that you give favorable consideration to our claim for additional compensation to reimburse us for our loss in connection with this contract.
On January 7, 1944, the plaintiff also submitted War Department PAS-CD Form No. 6, entitled “Final Eeport of Project Costs,” showing the gross job loss of $42,961.54, including home office overhead expense allocated in the sum of $2,696.97.
By letter of March 25, 1944, the plaintiff claimed $43,-874.50 with allocations to the respective items set forth above.
25. By letter of April 21, 1944, the contracting officer advised the plaintiff that Items 1 to 7 of its claim were denied and that its claim under Item 8 in the amount of $341.88 for additional cement used would be compensated for under Paragraph 4-12 of the specifications upon a determination of the additional cost incurred.
The contracting officer determined that, since no provision was made in the specifications as to when materials would be delivered and no guarantee was specified against delays by late deliveries, Item 1 of plaintiff’s claim was without merit. Paragraph 1-05 (c) of the specifications was cited providing that the contractor would not be penalized for failure to complete the work on account of delays in the deliveries of materials or supplies, by reason of war priorities and without the fault or negligence of the contractor. He considered that the same conditions would apply to Government-furnished materials.
Items 2, 3, and 4 were denied for the reason that excessive moisture was evident in the ground at the job site and that it should have been apparent this condition was due to subsurface leakage before the proposal was submitted.
Item 5 was denied for the same reasons as Item 1. Item 6 was denied for the reason that an allowance should have been provided in the plaintiff’s bid for making connections with the existing basin while it remained in service. Under Item 7 of the claim, the contracting officer found no evidence of inspection exceeding the requirements of the contract and specifications.
On May 16,1944, the plaintiff appealed from the decision of the contracting officer.
*585 26. On May 23,1944, Modification No. 3 was issued, awarding the plaintiff a lump sum of $344.88 as claimed for the additional cement used in the concrete poured on this job, over and above the strength of concrete specified.
27. On May 23,1944, the contracting officer issued his finding of fact, a copy of which was transmitted to the plaintiff by letter of August 11, 1944. These findings state in part:
2. In letter dated 18 November 1943 (Incl. No. 1), addressed to the Area Engineer, Camp Gruber, Oklahoma, the contractor advised that he had suffered a loss on the contract amounting to between $35,000 and $40,-000; that there were a number of “things” encountered which were not his fault and for which he should be paid; and that he thought the contract should be renegotiated. He requested a hearing on the case.
3. By letter dated 29 November 1943 (Inc. No. 2), the Area Engineer requested the contractor to furnish further information as to items for which he felt he was entitled to additional compensation.
4. By letter dated 7 January 1944 (Inc. No. 3), addressed to the Area Engineer, Camp Gruber, Oklahoma, the contractor submitted a claim for additional reimbursement in no stated amount, but evidently was under the impression that he should be reimbursed for the amount of his loss on the contract. He listed and discussed eight items which he contended increased the cost of performing the work due to circumstances beyond his control.
5. In letter from this office, dated 29 January 1944 (Inc. No. 4) , the contractor was advised that in order to enable this office to consider the claim it would be necessary for him to establish that he was entitled to additional compensation under specific provisions of the contract or specifications, and to furnish a detailed breakdown of the extra costs incurred under each item of the claim.
6. The contractor, by letter dated 25 March 1944 (Incl. No. 5), failed to furnish any further contractual justification for his claim, but merely submitted a tabulation of the amounts requested under each item of the claim, which amounts totaled $43,874.50. No breakdown of the costs was furnished.
28. On June 15,1944, the plaintiff wrote the Secretary of War in respect to its appeal of May 16,1944, and submitted a breakdown as to increased costs of labor, material and over- *586 bead expense upon Items 1 to 7 of its claim, as set forth in finding 24 herein. The amounts allocated to the several items of claim totaled $43,532.62, exclusive of any profit, as follows :
Item 1_$38, 979.07
Item 2_ 2, 478. 69
Item 3- 194. 04
Item 4_ 139.97
Item 5_ 485. 99
Item 6_ 508. 64
Item 7_ 746.22
Total_ 43,532.62
29. The War Department Board of Contract Appeals, representing the Secretary of War, issued its decision on December 29, 1944. The Board awarded the plaintiff the amounts claimed under Items 2, 3, and 5 in the total sum of $3,158.72.
The Board found that the increased cost of the installation of the 12-inch V. C. drainage line, under Item 4 of the plaintiff’s claim, resulted from a backwash from the 18-inch V. C. line from the filter house to which the 12-inch line was connected and that both the plaintiff and the Government inspector knew of the possible backwash and the plaintiff was instructed to take measures to prevent it but failed to do so. An earth dam would have prevented the backwash until the smaller line had been laid. It also determined that the leakage along the south walls of the existing settling basins might have interfered with the excavation for this 12-inch drainage line because of its proximity but that work was stopped until the leakage was remedied and the cost thereof was included in Item 3 of plaintiff’s claim.
With respect to Item 6, the Board reported in part as follows:
While the appellant apparently did not anticipate the need for bulkheads, there is no showing that the Government gave any assurances with respect to lowering the water for longer periods, or that the 8-hour period was not a reasonable limitation based on necessary requirements for operation of the plant. There was no showing that the appellant made any inquiry as *587 to this condition before entering into the contract, or was in any way misled. In the opinion of the Board the construction of bulkheads was a normal incident of the work, under the conditions existing at the site.
Items 4 and 6 were denied by the Board. With respect to the remaining items, the Board stated:
* * * Claims Nos. 1, 7 and 8 haying been withdrawn or paid, the appeal is dismissed with respect thereto.
30. Modification No. 4 was issued on January 25, 1945, awarding the plaintiff the lump sum of $3,158.72 for additional excavation, backfill, pumping and concrete work resulting from leakage of the existing settling basin and the 18-inch V. C. pipe line.
The plaintiff was paid $38,765.85 under its contract consisting of the contract price of $35,210, changes amounting to $55.25 (finding 20), additional cement over that specified in the sum of $341.88 (finding 26), and $3,158.72 for the additional work resulting from leakage of existing structures.
31. No additional costs are found resulting from the leakage of existing structures, other than the claims previously made and awarded in Modification No. 4.
The evidence does not justify a finding that the inspection was unduly rigid or that the plaintiff incurred increased costs by reason of inspection limitations or restrictions in performing the work according to specified requirements. Piping that was embedded in walls was required to be installed before the concrete was poured for a watertight seal.
The plaintiff incurred costs of approximately $508.64 in constructing watertight bulkheads for making two cuts into the wall of the adjacent existing settling basin for connections with the new structure. No amount was included in plaintiff’s bid estimate for this work. The resident engineer declined to lower the water in the existing basin for a sufficient period to complete the work. It was within the province of the contracting officer to determine the adequacy of water for camp use at all times.
The plaintiff made no written protest against constructing the necessary bulkheads or the methods of performing the *588 contract work for which it now claims its increased costs.
32. The plaintiff submitted an accounting for $25,111.13 of its loss which it attributed to delays in the delivery of materials furnished by the defendant. This sum represents all costs incurred after August 17, 1943, in the amount of $28,380.58, less materials, subcontract work, equipment and sundry items in the sum of $3,492.65, which the plaintiff concedes would have been necessary had the work been performed prior to August 17, plus $223.20 representing the cost of rebuilding forms prior to August 17, 1943.
The plaintiff experienced some delay in the construction of the settling basin toward the end of July 1943, because of its inability to obtain sufficient reinforcing steel (finding 18). The delay in the construction of the filter unit began about the middle of July and continued thereafter until August 11 by reason of the delay in the delivery of the 16-inch cast-iron drainage pipe furnished by the Government (finding 20). It continued thereafter from about August 12 until about September 10, partly on account of the 12-inch cast-iron specials furnished by the plaintiff which were not received until August 26 (finding 21). Since the construction of the filter unit was performed largely after August 17 and since the delay thereafter resulted in part by late deliveries of plaintiff’s materials, all of such costs cannot be properly attributed to delays in deliveries of materials furnished by the defendant.
33. The plaintiff’s total cost of performing the contract, with the modifications, was $77,156.18. It was paid the sum of $38,765.85, including the modifications, and sustained a loss in performance of $38,390.33.
The modifications increased the bid price by $3,555.85 and consisted of the following approximate additional costs:
Labor and job supervision-§2,326.92
Materials_ 785.40
Equipment expense- 443. 53
The plaintiff’s bid price, plus actual costs for modifications, included the following estimates. They are compared with its actual costs, as follows:

*589
Bid estimates Actual and modifications cost

Job labor, payroll taxes, and insurance— $15,552. 66 $50,842.22
Materials_ 9,907.46 10,049.99
Equipment expense_ 3, 549. 78 9,728.22
Subcontracts:
For plumbing and electric work- 2, 090.00 3,021.99
For grading_ 285.75 -„—
Overhead expense- 2,500.00 2,358.85
Contingency-miscellaneous expense- 2,670.20 944.91
Bond_ 210. 00 210.00
Profit _ 2,000.00 _
Total_ 38,765.85 77,156.18
34. There is no evidence to sustain a finding that the plaintiff was at fault or that it was negligent in the performance of the contract. The defendant’s officials endeavored to obtain more prompt deliveries of materials after the plaintiff began the work. The plaintiff had knowledge of the efforts being made. It made no written protest of changed conditions during the performance period. The plaintiff made no request for relief until after the work was completed. The making of claims from time to time was waived and consideration was given to plaintiff’s claims on the merits by the contracting officer, after completion of the work.
35. The plaintiff’s bid estimate was $2,320 lower than the defendant’s estimated performance for the work required under its contract. It was only $1,409 lower than the average of the next three higher bidders. The plaintiff made no allowance for the construction of bulkheads in the existing settling basin, which became necessary by reason of the fact the defendant’s engineer refused to lower the water a sufficient length of time to perform this work. This work cost approximately $508.64. The plaintiff did provide in its bid estimate a contingency provision that would more than offset this additional cost, also a profit allowance of $2,000.
36. It is found that the plaintiff’s bid price was equal to the fair and reasonable cost of performing the work specified under its contract and specifications. The plaintiff’s loss of $38,390.33 represents the excess cost of performance by reason of delays in the deliveries of materials. One-half of this excess cost was sustained by delays in the deliveries of Gov- *590 ermnent-furnished materials concurrently with, similar delays in the deliveries of materials furnished by the plaintiff (findings 21).
The excess cost sustained solely by reason of delays in the deliveries of materials furnished by the defendant was $19,195.16.
CONCLUSIONS OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover on Count I of the petition, and the petition as to Count I is therefore dismissed; and the court further concludes that the plaintiff is entitled to recover on Count II of the petition in the amount of $19,195.16.
It is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of nineteen thousand, one hundred ninety five dollars and sixteen cents ($19,195.16).

 The Chalender Construction Company was operated by John W. Chal-ender, Jr., but because of the possibility of his being called into military service, and to avoid complications that might arise, this contract was executed and entered into by his wife, Kern E. Chalender, and this suit brought in her name.

 60 Stat. 902, as amended by 62 Stat. 869, 992, 41 U. S. C. (Supp. V App.), Sec. 106 note.

 Now 49 (c) (3) under our present Rules which were adopted October 15, 1953.