PeR Curiam;
: This case is before us on the findings of fact and recommendation for conclusion of law of Trial Commissioner C. Murray Bernhardt, supported by an opinion. We adopt the Trial Commissioner’s recommendation and his findings of fact, with a slight correction, and judgment will be entered accordingly.
The correction in the Trial Commissioner’s findings is this: He finds that the parties agreed that the amount of damage suffered by plaintiff amounted to $11,439.62. In fact, the parties stipulated that the plaintiff’s evidence would show, if introduced, that it had suffered damages in the amount of $11,439.62, but defendant introduced no evidence to contradict plaintiff’s evidence. There was, therefore, an implied admission by defendant, but no express admission. Finding 35 has been corrected to more accurately state the facts as to the stipulation on the amount of damages.
The opinion of the Trial Commissioner, without correction, is hereinafter set forth.
Plaintiff is entitled to recover $11,439.62, and judgment for this amount will be entered.
It is so ordered.
OPINION OP THE COMMISSIONER
The critical question in this case is whether the defendant acted reasonably in partially halting the plaintiff’s use of questionable concrete for a one month period in 1955 in the course of performance of two contracts for the construction of several concrete structures at the Klamath Falls Air Force Base in Oregon, thereby delaying the plaintiff and causing it damages in the agreed amount of $11,439.62. Plaintiff has exhausted its administrative remedies, its appeal to the head of the department having been dismissed for lack of jurisdiction.
In 1955 and 1956 eleven prime contracts were underway, let by the Navy for the use and benefit of the Air Force, to convert the Klamath Falls Municipal Airport into an urgently needed airbase for the United States Air Force. *435 Two of the eleven contracts were let to the plaintiff, who was directed to proceed on June 27, 1955, and was scheduled to finish on November 24, 1955. The plaintiff mobilized and commenced the jobs with reasonable diligence, as illustrated in part by the fact that the first concrete was poured on July 15, and the defendant’s contentions to the contrary are not persuasive.
The contracts contained detailed specifications for the concrete to be used. The plaintiff contracted with the Miller Construction Company, a local supplier of concrete and aggregate, to supply transit mixed concrete that would comply with all specifications. The plaintiff had requested beforehand the defendant’s approval of Miller as a source of concrete for the jobs, and the defendant had given its approval “providing it [the Miller Company concrete] meets the subject specifications and contract requirements.” The plaintiff contends that this approval by the defendant absolved the plaintiff from responsibility for deficiencies in the concrete which developed subsequently. The plaintiff cannot shed so easily its contract obligation of providing all labor, equipment and materials in strict accordance with specifications.
On August 2, 1955, when forms were stripped from concrete which the plaintiff had poured in late July, some of the concrete was badly “spalled”, that is to say, in places the concrete had formed a stronger bond with the wooden forms than with its own mass so that facings had sheared off leaving pockmarks, holes, cracks and rough surfaces. A large piece had come off altogether and still more could be pulled off manually. Representatives of both parties attributed the condition to the use of dirty aggregate (i.e., in this case the crushed stone) in mixing the concrete, which had the effect of preventing a bond between the aggregate and the cement. The defendant’s resident officer in charge of construction had the contract right to require the plaintiff to remove and replace all defective concrete, but he felt this instance to be the result of an accidental contamination of an isolated batch and, anxious not to delay completion, he permitted a partial replacement of one broken pilaster and the patching of other defects. Later Miller Com *436 pany paid the plaintiff $417.56 representing the agreed cost of certain ingredients which had been omitted from the defective concrete misture, and this amount was deducted by the defendant from the plaintiff’s vouchers. Both parties considered this defective concrete to be clearly the result of dirty aggregate, and Miller Company was instructed on August 3 that it would have to wash its aggregate carefully to prevent recurrences. On August 10 Miller Company installed a temporary, makeshift method of washing its aggregate which, while crude, seemed to accomplish the job satisfactorily judging from a virtual lack of defective concrete poured after August 10 as shown in subsequent cylinder tests. The plaintiff continued to pour concrete throughout August without hindrance by the defendant.
Each time a batch of concrete was poured the plaintiff filled one or more test cylinders with samples from that batch. These test cylinders were allowed to cure for 28 days and then were broken open and their hardened concrete contents were subjected to so-called compressive strength tests to determine their compliance with the compressive strength requirements of the specifications. Thus, the concrete poured in the last half of July and early August was not ripe for testing until the last half of August and early September, and when tested it was revealed that the contents of the test cylinders representing nine out of 25 batches of concrete poured prior to August 10 were deficient in compressive strength. In a sense this merely corroborated what the parties had reason to suspect on August 2 when the forms were first stripped, namely, that certain of the concrete poured in late July was defective due to the use of dirty aggregate in its mixing.
To further corroborate this alarming condition the defendant’s resident officer directed the plaintiff on August 31 to cut sample concrete cores from specified parts of the suspected structures. This was done and again confirmed what was already known.
Most or all of the other contractors performing the other nine prime contracts at the airbase were also procuring their concrete from Miller Company, and at least some of them were experiencing the same spotty results as the plaintiff, *437 though, in lesser degree. It was known that aggregate procured from local sources was excessively alkaline due to natural geology, and that this condition unless controlled affected the durability and other characteristics of concrete. The defendant’s resident officer was naturally concerned for fear that the prevalent use of Miller Company’s concrete might cause basewide problems in all the contracts underway, including the two in suit. Therefore, the contracting officer dispatched a concrete expert to the scene to survey the problem and advise as to what to do. After investigating conditions at the jobsite from August 30 to September 2, he found that the Miller Company’s crushed rock aggregate was mixed with a great deal of dirt while being quarried, that it was reasonably clean after being washed in Miller’s makeshift facilities, but that it became heavily recontaminated with dirt during the concrete mixing process due to the dirt which had accumulated in the mixer bins over a long period. To this latter condition he attributed the concrete failures in the instant contracts.
The Navy was required under the contracts to have an inspector present at the batching plant whenever concrete was being mixed in order to insure correct proportions, but actually one was there only sporadically because the Navy’s staff on the job was shorthanded. Had an inspector attended each mixing he could undoubtedly have observed the condition of the aggregate and have done something to have it corrected, but this provision of the contracts was one designed for the protection of the defendant rather than the plaintiff, and the defendant’s failure is not such as to discharge the plaintiff from its primary burden of providing suitable concrete. Actually, from the installation of Miller Company’s temporary aggregate washing facilities on August 10 to its replacement with a permanent washing system on October 3, the test cylinders for only one out of sixteen batches of concrete mixed for the plaintiff in this period failed to meet compressive strength requirements, so apparently after August 10 Miller Company’s product was substantially improved and up to specifications, even if the defendant could not be sure of it until 28 days after each pour.
*438 On September 3 the defendant’s concrete expert, who had just concluded his visit to the jobsite, instructed Miller Company to suspend the supply of concrete until further word, and on September 7 the defendant’s resident officer in charge of construction ordered the plaintiff in writing to restrict his concrete pouring to “concrete operations for non-exposed work using clean local aggregate which complies with the specifications * * pending the development of further information on the characteristics of local rock. The other prime contractors on the base were sent similar orders.
In May 1955 the defendant had contracted with the Northwest Testing Laboratories to conduct all specification testing of building materials used in the various contracts underway. On September 7, at Miller Company’s behest, Northwest Laboratories inspected Miller Company’s facilities and reported, after making a sieve analysis of the aggregate, that the aggregate was satisfactory and that the mixing bins and hoppers were clean, the latter finding being reconcilable with the contradictory report made a few days earlier by the defendant’s concrete expert only if it is assumed that Miller Company had cleaned the bins and hoppers in the intervening period.
On September 12 the plaintiff, only recently restricted to the pouring of concrete in locations not exposed to the weather or to the erosive action of water or heavy traffic, warned the defendant that the completion of the work was being seriously delayed because certain outside installations had been ready for pouring for several days. To this the defendant replied on September 14 adhering to its earlier position and offering to accept concrete for use in exposed locations only if it contained aggregate from other sources that had had a satisfactory record of use elsewhere in comparable construction for a five-year period. On September 19 the plaintiff submitted to the defendant a list of other suppliers whose product would meet the requirements imposed, but at a higher cost which the plaintiff felt the defendant should absorb. In this letter the plaintiff promised to submit a separate proposal describing its additional cost attributable to the delay. To this the defendant replied on September 22 reiterating its position that furnishing ac *439 ceptable concrete was the contractor’s responsibility, and stating that no change order would be issued to coyer the proposals in the plaintiff’s letter of September 19.
By this time the defendant’s resident officer was genuinely worried oyer the concrete problem and, on September 20, ordered the Northwest Testing Laboratories to test samples of aggregates procured from various suppliers within a wide area of the jobsite. From then to October 10 Northwest Laboratories ran exhaustive tests compressing into that time, by dint of overtime, testing procedures which normally would have taken 30 days collectively. The plaintiff contends that, since only the cleanliness of the aggregate was in doubt, these other tests were superfluous even though they were permissible under the contracts. Except for the freeze and thaw test, which had nothing to do with determining the cleanliness of the aggregate, all of the tests performed on the aggregates by Northwest Laboratories during this period could have been completed in seven days. Cleanliness alone could have been determined by a simple sieve analysis taking less than one day. The Miller Company samples of aggregate passed all the tests to which they were subjected by Northwest Laboratories, but this fact was not known until the tests were completed on October 8, whereupon the plaintiff was notified orally that Miller Company’s concrete was approved and the plaintiff resumed concrete pouring on October 10.
Upon the clearing of Miller Company’s concrete the plaintiff and all of the other contractors on the base who had been similarly affected by the temporary halt presented their accumulated demands to Miller Company with the result that concrete had to be rationed for several weeks and the plaintiff was not able to maintain normal operations under the contracts. This period of short supplies can be considered to have been the proximate consequence of the temporary shutdown of Miller Company. Had Miller Company not been shut down and had concrete not been in short supply for several weeks following the reopening of Miller Company, the plaintiff could probably have completed all concrete work by the end of October. As it was, the sequence of delays precipitated originally by the closing down of Miller *440 Company caused the plaintiff to defer much, of its concrete placement until the onset of unusually severe winter weather, thus resulting in substantial work interruptions on many days of inclement weather and attendant greater expenses. The contracts were eventually completed and the defendant issued change orders for certain additional work which extended the times for performance to coincide with actual completion dates so that no liquidated damages were charged the plaintiff.
It was held in George A. Fuller Company v. United States, 108 Ct. Cl. 70, 94, 95, as follows:
It is true there is no express provision in the contract which renders the Government liable for delays it may cause the contractor in the performance of the work, nor is there any express, provision exempting it from liability for such delay; it is, however, an implied provision of every contract, whether it be one between individuals or between an individual and the Government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance.
* ❖ ❖ # *
* * * one who, while not preventing the other party from carrying out the contract, nevertheless hinders or delays him in doing so, breaches the contract, and is liable for the damage which the injured party has sustained thereby. * * *.
More recently in Peter Kiewit Sons Co., Inc., et al., v. United States, 138 Ct. Cl. 668, 674, the court said:
* * * However, where the Government or its authorized representatives are guilty of some act of negligence or willful misconduct which delays the contractor’s performance, the Government is liable for the resulting damages, Chalender v. United States, 127 C. Cls. 557. This is so because there is in every Government contract, as in all contracts, an implied obligation on the part of the Government not to willfully or negligently interfere with the contractor in the performance of his contract, Chalender, supra; Fuller v. United States, 108 C. Cls. 70. * * *
It must be decided whether the behavior of the defendant’s representatives was reasonably calculated to protect the necessary interests of the Government without unjust delay to *441 the contractor, or whether some other action could and should have been taken which would have accomplished legitimate objectives and have been less disruptive to contract performance. Section 9(b) of each contract provides in part that “All inspections and tests by the Government shall be performed in such manner as not unnecessarily to delay the work.” When the concrete expert dispatched by the contracting officer ordered Miller Company on September 3, without benefit of consultation with others, to suspend all further deliveries of concrete until further instructions, he did so primarily because the aggregate mixing bins were dirty and would, unless cleaned out, contaminate the concrete. He observed, of course, that the quarry operated by Miller Company produced an inferior material in that so much dirt was interspersed with the rock in place, but in his own words the crushed rock was reasonably clean after washing and prior to mixing, so the objectionable condition of the rock in place or as quarried was not only correctable but corrected as well. As early as August 2 when defective concrete was first discovered upon stripping of forms it was clear to all that the fault lay in the use of dirty aggregate, and this knowledge was confirmed by the compressive strength tests given at the end of August to samples of the earlier concrete pours taken from cylinders and cores from suspected structures. Some doubt existed, it is true, as to whether the local rock sources were not excessively alkaline, but it was felt that the problem lay in the lack of cleanliness of the coarse aggregate and not in other chemical or physical characteristics of the rock itself. In its pre-design investigations of the Klamath Falls area the defendant had found that all local rock was alkaline, and if it really suspected it to be unsuitable on that account it owed some measure of duty to bidders to advise them of that fact or to test the rock for verification, since it could be assumed that all contractors would naturally procure aggregate from the nearest available sources. The concrete expert narrowed the source of contamination to the mixing bins where the washed aggregate again picked up deleterious material. It would have been more reasonable under the circumstances for the expert to have suspended Miller Company until the bins *442 were thoroughly cleaned out, rather than to close the plant down indefinitely. Had he done so it is clear in retrospect that the concrete would have been satisfactory, for virtually all of the concrete poured after August 10, when Miller Company instituted its makeshift method for washing aggregate, turned out to be in compliance with specifications. If he had had substantial reason to suspect that the coarse aggregate suffered from chemical or physical deficiencies other than lack of cleanliness that would have made it unsuitable for the purpose, then the case may have been different, but in that case he should then not only have closed down the Miller Company’s plant but should also have directed Northwest Testing Laboratories to commence testing procedures without delay.
On September 7 the Northwest Testing Laboratories inspected Miller Company’s facilities at the latter’s request and, on the basis of visual observation and a simple sieve analysis, found the aggregates and the mixing bins and hoppers to be free from deleterious materials, an indication that Miller Company had complied with directions to clean up. On the same day the defendant’s resident officer wrote to plaintiff and other Government prime contractors on the base moderating in part the complete shutdown by permitting clean local aggregate to be used in concrete for non-exposed work only. These letters mentioned the possibility that local rock was excessively alkaline, that pending further information on the characteristics of local rock concrete could be poured on non-exposed locations using concrete containing local aggregate, and that contractors should investigate alternate sources of aggregate since local rock might turn out to be totally unacceptable. If the resident officer had sound reason to suspect that Miller Company’s aggregate was deficient in respects other than cleanliness, then it would have been more reasonable for him to have immediately directed Northwest Testing Laboratories to perform tests without delay of that aggregate alone, instead of waiting until September 20 to direct Northwest Laboratories on that late date to procure and test samples of aggregate not only from Miller Company but from various other suppliers within a wider area of the jobsite. A sieve *443 test of the Miller Company’s aggregate could have determined its degree of cleanliness and could have been performed in less than one day, as indeed had just been done by Northwest Laboratories with affirmative results. The Miller Company’s aggregate could have been run through all of the other tests, except the freeze and thaw test, to determine its total compliance with contract specifications, and the results would have been available by September 13. In fact, there was as much factual awareness of the location, extent and cause of the concrete failures by the end of August as there was on September 7, and had Northwest Laboratories been ordered to test Müller Company’s aggregates at the end of August still more time could have been saved. The resident officer acted not out of vindictiveness but out of an excess of caution, prompted by a not unnatural fear that the entire airbase might be imperiled by an epidemic of defective concrete originating from Miller Company. All of the information available to him at that time pointed its finger unerringly at dirty aggregate as the cause of concrete failures, and other possible deficiencies in the aggregate were merely secondary speculations to which no results had yet given substance for belief. The remedy he prescribed exceeded the patient’s symptoms. In trying to avoid what he thought was a gamble with poor aggregate, the resident officer entertained a greater gamble that the project would not be completed on time, and lost both wagers.
From September 23 to October 10 Northwest Laboratories ran elaborate tests of 18 aggregate samples from six suppliers, including samples from the Miller Company. Miller Company’s samples passed every test, and plaintiff resumed pouring concrete on that day, with the subsequent delays and expenses that have been described earlier as being proximately attributable to the summary shutdown of the Miller Company’s plant. On balance, these delays must be charged to the defendant.
Finally it is contended by the defendant that Drake Company is bound by certain admissions it made in earlier litigation in the Oregon state courts wherein it was sued by Miller Company for non-payment of concrete furnished *444 under the instant contracts in suit and both defended and counterclaimed on the general grounds that Miller Company supplied defective, substandard concrete that did not comply with contract specifications. Such allegations appeared in Drake Company’s pleadings and presumably were supported by evidence at trial. The Oregon court entered judgment for Miller Company and ruled that Drake Company had failed to prove that any concrete supplied by Miller Company was defective except that poured in late July. That case is now on appeal. Certain pleadings in the former case were admitted in evidence here over objections by the plaintiff, it being overwhelmingly clear that admissions made in pleadings in prior litigation are admissible in evidence in a later case against the interest of the pleader and in favor of a stranger to the prior litigation (14 A.L.N. 56; 90 A.L.R. 1398). Such admissions are sometimes referred to as informal or quasi-admissions to distinguish them from judicial admissions. Quasi-admissions lack the force and estoppel effect of judicial admissions, which latter operate only in the cause in which the admissions appear. Wigmore on Evidence, 3rd Ed., Sec. 1066. This principle operates to make admissions in pleadings in a Federal court case admissible against the pleader in a subsequent suit by him in a state court (Cerf v. McElroy, 25 S.W. (2d) 950), and no doubt the reverse is true. Such admissions are not conclusive but are subject to explanation and contradiction. Nelson Bros. Coal Co. v. Perryman-Burns Coal Co., 48 F. 2d 99, is a case in point. There, in an action against the respondents for services rendered in salvaging and raising a barge which had sunk with a load of coal, the title to which was in question, the district court said that a verified complaint filed by the respondent in an action in the state court against an insurance company should be “given weight”, but the circuit court, per J. Augustus Hand, in reversing the case on the grounds of the passage of title, said the admissions in the state court action “were not conclusive, even though they had some probative force. In view of all the testimony, they amounted to little more than an opinion expressed by [the respondent] as to its legal rights — an opinion with which it may be noted the New York Supreme *445 Court did not agree.” A similar principle is present in Pope v. Allis, 115 U.S. 363. At most Drake Company’s assertions in its pleadings opposing the Miller Company’s complaint were merely an expression of its contentions whose effect as admissions against interest is only to be considered along with all the other evidence and is not conclusive. Nor are such admissions sufficient to overcome the weight of the facts which led both this writer and the Oregon court to conclude that, with certain exceptions, the Miller Company’s concrete complied with contract specifications.
The plaintiff is entitled to recover $11,439.62 from the defendant.
EINDINGS OP PACT
1. Plaintiff was at all times hereinafter mentioned an Oregon corporation with its office and place of business at Portland, Oregon.
2. On June 22, 1955, plaintiff and defendant entered into Contract No. NOy-84879 (hereafter shortened to Contract 879) for the construction of an Alert Hangar, Flight Simulator Training Building, Beady-Bocket Storage Building, and EXP and ATO Storage Igloos, and into Contract No. NOy-84887 (hereafter shortened to Contract 887) for the construction of a Beadiness Crew Building, Cold Storage Building and recreational facilities, all structures to be constructed at the Klamath Falls Air Force Base, Klamath Falls, Oregon. The contracts were let and supervised by the Navy Bureau of Yards and Docks and involved the conversion of the Klamath Falls Municipal Airport into an airbase for the United States Air Force. The plaintiff was to furnish all labor, equipment and materials and perform the construction work in strict accordance with the contract provisions and specifications and addendums thereto.
3. Both contracts provided that all material and workmanship were subject to inspection, examination and test by the Government at any time and at any place of manufacture and/or construction, and that the Government should have the right to reject defective material and workmanship or require its correction. The contracts additionally provided that the contracting officer should determine which *446 materials were to be inspected or be given chemical or physical analysis or other inspection or test. The sampling and test procedures under the contracts for aggregates were to be in accordance with the Federal specifications of Methods of Sampling and Testing SS-Kr-406. Section 9 (b) of each contract provided in part that “All inspections and tests by the Government shall be performed in such maimer as not unnecessarily to delay the work.” The specifications in each of the contracts were identical with respect to concrete construction and provided for the application of Specification for Concrete Construction No. 13 Yd of June 1951 wherever references to standard specifications appeared.
4. Specification 13 Yd for concrete construction provided in pertinent parts as follows:
2-01. Oement shall be portland cement in accordance with Federal specification no. SS-c-192. Unless other types were required by the project specification or are authorized specifically, type I shall be used except that type I-A may be used for air-entrained concrete.
2-02. Water shall be clean and free from injurious amounts of oil, acid, salt, alkali, organic matter, and other deleterious substances. When subjected to the test for structural strength of fine aggregate given in Federal specification no. SS-B.-406, method no. 206.0, the strength at 28 days of mortar specimens made with the water under examination and normal portland cement shall be at least 95 percent of the strength of similar specimens made with water of known satisfactory quality and the same cement.
2-03. Fine aggregate, * * * shall consist of natural sand, or, subject to approval, other inert materials having similar characteristics. It shall be in accordance with Federal specification no. SS-A-281, except as modified herein, and shall be grade A, except that it may be grade B for use in concrete for structures or portions of structures not exposed to freezing weather. Fine aggregate shall be free from water-soluble alkali and from substances which might cause expansion in the concrete from reaction with alkali hi the cement; * * *. ❖ # # * %
2-05. Coarse aggregate, * * * shall consist of crushed stone, gravel, or,, subject to approval, other inert materials, having similar characteristics. It shall be in accordance with Federal specification no. SS-A-281, *447 except as modified herein, and shall be grade A, except that it may be grade B for nse in concrete for structures or portions of structures not exposed to freezing weather. The requirement for resistance to abrasion will be waived where the aggregate will be used in concrete not to be subjected to abrasive action. Coarse aggregate shall be free from water-soluble alkali and from substances which might cause expansion in the concrete from reaction with alkali in the cement; * * *.
‡
2-14. Storage of materials.
* * * # *
II. Aggregates shall be stored on areas covered with tightly laid wood planks, sheet metal, or other hard and clean surface, and in a manner that will preclude the inclusion of foreign material. Aggregates of different sizes shall be stored in separate piles. Stock piles of coarse aggregate shall be built in horizontal layers not exceeding 4 feet in depth to avoid segregation. Should the coarse aggregate become segregated, it shall be remixed to conform to the grading requirements given hereinbefore.
5. Federal Specification SS-A-281, referred to in Sections 2-03 and 2-05 of the material specifications in the preceding finding 4, was superseded on July 8, 1954, by SS-A-281b, entitled “Federal Specification — Aggregate; (For) Portland-Cement-Concrete”. With respect to deleterious substances, alkali and moisture specifications, SS-A-281b provided as follows:
3.1.3 Deleterious substances. — The amount of deleterious substances in fine aggregate, each determined independently on samples complying with the grading requirements given in 3.1.2.1, shall not exceed the limits given below:

Maximum percent Item by weight

Olay lumps- 1.0
Material finer than No. 200 sieve:
(a) Concrete subject to surface abrasion- 3.0
(b) Other concrete_ 5.0
Saturated surface-dry material, coarser than No. 50 sieve, floating on liquid having a specific gravity of 2.0_ 0.5
3.1.4 Organic Impurities.
3.1.4.1 Fine aggregate shall be free from injurious amounts of organic impurities. Except as herein provided, aggregates subjected to the test for organic im *448 purities and producing a color darker than the standard shall be rejected.
* * * ❖ ❖
3.2.3 Deleterious substances. — The amount of deleterious substances in coarse aggregate, each determined on independent samples complying with the designated grading requirements of 3.2.2, shall not exceed the limits given below:

Maximum, percent Item T>y weight

Clay lumps_ 0.25
Soft particles_ 5. 0
Material finer tlian No. 200 sieve_ 1. 0
Saturated surface-dry material floating on liquid having specific gravity of 2.0_ 1. 0
3.2.4 Reaction with alhali in cement. — Coarse aggregate for use in concrete which will be subjected to adverse conditions with respect to moisture content (see 6.2) shall be free from material which could react harmfully with alkalies in the cement. If such materials are present in injurious amounts, the coarse aggregate shall be rejected unless used with such a cement that mortar or concrete is prepared which will not develop undue expansion caused by the alkali-aggregate reaction, or be used with the addition of a material which has been shown to inhibit the expansion caused by this reaction * * *.
# # í*í ifc
6.1 Intended use. — This specification is regarded as adequate to insure satisfactory materials for most concrete. It is recognized that, for certain work or in certain regions, it may be less restrictive than needed.
6.2 Adverse moisture conditions. — Expansion due to the alkali-aggregate reaction appears to develop to the most marked extent only when the concrete is wetted frequently but intermittently as by rain- or snow-fall, or is subjected to extended exposure to moist air, or is in contact with moist ground. Concrete which is continually saturated with water does not seem to be subject to the effects of this reaction.
6. The plaintiff was issued a notice to proceed effective June 27, 1955. The scheduled completion date for both contracts was November 24, 1955. Construction called for by these and nine other contracts (by other contractors) at the airbase was urgently needed and time was of the essence. Immediately upon receipt of the notice to proceed the plain *449 tiff began to mobilize personnel, equipment and supplies for performance of the contracts. The plaintiff’s supervisory-personnel, including two officers, two foremen, and a field superintendent arrived at the jobsite for the first time on July 6,1955, and conferred with defendant’s project engineer and three inspectors. During the immediately ensuing period the plaintiff erected its temporary storage and utility shacks.
7. The first contract “pay” work done by plaintiff at the jobsite under Contract 887 was to excavate for footings at the Eeadiness Crew Building on July 11, 1955. Work on the other buildings under this contract started on July 12, 15 and 25, and August 3, 1955, respectively.
8. The first contract “pay” work done by plaintiff under Contract 879 was to set the batterboards and excavate foundations at the Flight Simulator Training Building on July 13,1955. From July 18 through 21 no work was done under this contract because first, the Navy directed a change in certain floor elevations on July 20, and second, the Navy instructed the plaintiff to hold up operations until a power cable crossing the corner under one of the proposed buildings could be moved to a safer place. There was some delay in arriving at an agreeable price. An oral change order was given plaintiff on July 20, confirmed later by a formal change order which provided no time extension. There is no showing that the plaintiff was responsible for the work shutdown from July 18 through the 21st. Work resumed under the contract at the Igloos on July 22, at the Eocket Storage Building on July 25, and at the Alert Hangar on August 5.
9. The Navy’s Eesident Officer in Charge of Construction gave no direction at any time to the plaintiff to speed up its performance of either of the contracts, because this officer’s policy was that the direction of the work was the plaintiff’s responsibility. But he did observe to the plaintiff that its performance did not give prospects of completion within a reasonable time. The evidence would not support the conclusion requested by the defendant that the plaintiff was guilty of delays in the early part of contract performance, although by the end of August the contract was somewhat behind schedule.
*450 10. The contract specifications called for a certain formula for the concrete mix, which was the principal construction material used in the contracts in suit. The aggregates (i.e., sand and gravel) to be used in mixing the concrete were to be of a certain size and quality. When the Navy’s Resident Officer in Charge of Construction (hereafter shortened to Resident Officer) arrived at the jobsite in April 1955 he had noticed that many concrete sidewalks in the Klamath Falls vicinity of the airbase were badly deteriorated and he caused an investigation to be made of the reason therefor. The investigation disclosed that at least one factor which may have been responsible for the deteriorated concrete sidewalks was the excessive alkilinity in the coarse aggregate produced in the Klamath Falls area, which excessive alkilinity affects the durability of concrete produced therefrom. Excessive dirt in the aggregate is another factor which may affect adversely the binding quality of the concrete and reduce its compressive strength. But the Resident Officer did not know how long the deteriorated sidewalks had been in place or who had supplied the concrete for them.
11. The supply of ready-mixed concrete in the Klamath Falls area was limited to the W.D. Miller Construction Company (hereafter referred to as Miller Company) and Acme Concrete Company. The plaintiff had no mixing or batching plant of its own available in the Klamath Falls area. On July 12, 1955, the plaintiff wrote the following letter to the Resident Officer in reference to Contract 879:
Approval is requested to use Transit Mixed Concrete for all concrete under the above contract, to be procured from W. D. Miller Construction Company, Klam-ath Falls, Oregon. The mix designs will meet the requirements of the subject specifications. Portland Cement will be Type II, low alkali content produced at Gold Hill Plant of Ideal Cement Company.
Coarse and fine aggregates will be procured from same source as per samples previously submitted and approved under Contract NOy-84832, Specification No. 44408.
On the same date the plaintiff contracted with Miller Company to buy transit mixed concrete for both of the contracts in suit. The contract with Miller Company provided that *451 all concrete supplied would meet the specification requirements of the contracts in suit, to be mixed in accordance with Specification No. 13 Yd dated June 1951 (finding 4, supra). On July 14, 1955, the defendant’s project engineer advised the plaintiff by letter that the use of transit mixed concrete supplied by the Miller Company was satisfactory “providing it meets the subject specifications and contract requirements.”
12. The first concrete poured by plaintiff was at four of the jobsites under Contract 887 from July 15 through July 29, 1955, commencing with the Beadiness Crew Building. Pouring continued with all the buildings under this contract from August 2 through August 17, 1955. The first concrete poured by plaintiff under Contract 879 was on August 3, 1955, at one of the Igloos, and continued with that Igloo, the other Igloo, the Flight Simulator Building, the Alert Hangar, and Beady Bocket Storage Buildings from August 4 through August 31, 1955.
13. On August 2, 1955, upon stripping the wooden forms from the concrete poured on July 28 at the Beadiness Crew Building jobsite under Contract 887, an inspection was made by representatives of the parties. From pilasters designed to support the roof, from piers supporting the foundation walls, and from a partition wall itself, the concrete had “spalled” off, i.e., facings had sheared or flaked off with the forms, leaving pockmarks and holes, cracks, and rough surfaces, and a large piece had completely broken off. Some pieces of concrete could be pulled off by hand. An expert who was present attributed the general disintegration of the concrete to a lack of bond or binding between the mortar and the coarse aggregate due to a film of dirt on the aggregate and dirt and other deleterious substances within it.
14. In order not to delay completion of the job at the Beadiness Crew Building, defendant required plaintiff to replace only the broken pilaster with new concrete and to patch broken corners, cracks, pockmarks and holes according to the patching specification, Section 8, paragraph 8-01, Specification 13 Yd.
15. On August 3, 1955, Mr. Schwartz, of the Northwest Testing Laboratories, with whom the Government had contracted in May 1955 to conduct all specification testing of *452 building materials in the various contracts under way at the airbase, accompanied by a Government materials engineer, interviewed Mr. W. D. Miller (owner of the Miller Company), his yard foreman, concrete technician and another employee, and told them that it was necessary that the Miller Company aggregate be washed in order to make its concrete acceptable to the Government or anyone else. Miller stated he had never washed Ms aggregate and did not wish to do so. At this time it was generally felt by everyone, including the defendant’s Resident Officer, that dirty aggregate was responsible for the poor concrete discovered the preceding day.
16. On or about August 10, 1955, Miller Company instituted a crude method of washing the coarse aggregate. They loaded about five cubic yards of the crushed rock at a time in a dump truck with a false or screen bottom, upended the truck and laid a water hose with the nozzle at the top, allowing a stream of water to run from three to five minutes down through whatever aggregate it reached, and then through the screen underneath to the ground. This was merely a temporary method pending the setting up of a more efficient and permanent aggregate washing machine. The test of cleanliness of the rock was entirely visual by setting a glass milk bottle underneath the screen and catching some of the water dropping through, letting it settle in the bottle, and watching the level of dirt sediment at the bottom of the bottle until the water in the bottle became fairly translucent. The discovery of dirty aggregate did not at this time result in any interruption to the plaintiff’s program for pouring concrete, and the plaintiff continued without hindrance by defendant.
17. Each time that concrete was poured, samples were poured into test cylinders which, pursuant to specifications, were cured for 28 days and then broken open and subjected to testing by Northwest to determine whether their compressive strength was within specification requirements. The 28-day compressive strength tests given to the test cylinders representative of the 25 batches of concrete poured prior to August 10, when Miller Company instituted its make-shift system for washing the aggregate, revealed that nine of the *453 cylinder samples failed the compressive strength requirements. From the institution of the make-shift aggregate washing system on or about August 10, to the adoption by Miller Company on October 3 of an efficient system for washing aggregate, the test cylinders for only one of the 16 batches of concrete which were poured failed to meet compressive strength tests because of defective materials. Another test (not a cylinder test) of concrete poured August 31, 1955, for an Igloo indicated a failure in compressive strength. It must be remembered that there was a 28-day lag between the concrete pour and the testing of the cylinder sample representing that pour, so knowledge was necessarily tardy. Because of the poor showing of the test cylinders representing pours made during July and tested 28 days later, the Besident Officer in Charge of Construction wrote to the plaintiff on August 30 as follows:
Due to the fact that the 28 day break of cylinders taken from the Beadiness Crew Building was only 1,150 lbs., while the specifications call for 2,000 lbs. in 28 days, it will be necessary for you to cut two cores each from the center of the south foundation wall and the east wall of the Beadiness Crew Building, and two cores from the piers at the south end of the PX Building.
Your attention is invited to Section 9, Paragraph C, of the Special Provisions 23A of your contract.
If the concrete meets the requirements of the specifications, please furnish the Besident Officer in Charge of Construction with the cost of this work.
18. The test cores taken as directed in the foregoing letter verified the facts indicated by the tests performed on the cylinder samples, namely, that certain of the concrete poured on July 27, 28 and 29, 1955, was deficient in compressive strength. Specifically, compressive strength deficiencies were found in testing two cores from the Post Exchange Building, and four cores from the Beadiness Crew Building, although three of the latter may have been the result of encountering reinforcing steel. Instead of requiring the plaintiff to replace the defective concrete indicated by the cores that were taken, the defendant accepted the work and decreased the contract price by $417.56, which amount the plaintiff had previously deducted from bills paid to its concrete supplier, the Miller Company. This course was taken *454 largely because tbe defendant was in a hurry to have the contracts completed.
19. Under date of July 25, 1955, the plaintiff submitted to the defendant progress schedules required by the contracts. The schedules did not comply strictly with contract requirements, but the defendant did not insist on rigid compliance in this particular. Shortly after August 24, 1955, the plaintiff submitted a progress report and a request for payment covering the period through August 24, and payment was duly made accordingly.
20. From August 30 through September 2, 1955, Earl L. Hageman, Special Assistant to the District Public Works Officer and a competent engineer with special experience in concrete, inspected the jobsite and the Miller Company’s concrete plant and rock quarry. At the jobsite he observed concrete pourings by the plaintiff and attributed to inadequate vibration the honeycombed concrete surfaces visible in places, which defects he advised could be patched for cosmetic improvement. There is no correlation between spalling and honeycombing. The latter results from improper vibration or compaction during the pour, and does not of itself indicate a lack of compressive strength. Hageman reported in part as follows following his inspection of the Miller Company’s facilities:
4. Examined the Miller quarry on Thursday (1 Sept.). The rock face looked very bad and the instant impression is that the material should never have been used as an aggregate. The face is approximately 60' to Y0' in height. The top 10' or more consists of earth, some light weight volcanic froth or lava and some denser igneous rock. The entire rock face is seamed and broken both vertically and horizontally, beginning at the top with 3" to 4" cubes and ending at the bottom with segments having cleavage faces up to 12" x 30". In the upper part of the quarry the cleavage faces were coated with an inert substance resulting from oxidation and an intrusion of surface material. The crusher screens removed a large portion of this coating but enough remained to produce a dark colored smear over the crushed aggregate when dampened with water. This latter feature came to light at the batching plant when there was an attempt made to wash the aggregate. The appearance of the coarse aggregate as it passed from the *455 bins into the dry mix hopper was disturbing to say the least.
$ $ ‡ $
J. Dave [i.e., Lt. Comm. Feinman, the defendant’s Resident Officer in Charge of Construction] is very unhappy re: Quarry situation. He thinks the material being produced there is definitely inferior and would like to see the quarry abandoned as a source of Navy supply for rock aggregate. (Note: He apparently felt powerless to do anything about it.)
* * * ❖ *
h. [Recommend] that the coarse aggregate to be used in structural slabs and pavement be secured from sources other than the Miller Quarry.
21. In Hageman’s opinion, although the aggregate was mixed with a great deal of dirt in the course of being quarried and being reduced in the rock crusher, it was reasonably clean after being subjected to the Miller Company’s temporary washing procedure, but going through the dry mixing bins it became heavily contaminated with dirt, dust and silt which had accumulated in the mixers. He instructed the Miller Company’s superintendent to clean out the mixing bins without delay, since this was in his opinion the cause underlying the concrete failures in the contracts in suit. Hageman had observed Miller Company mixing some concrete with aggregate that had not been washed. There is no way of knowing whether or to what extent Miller Company had washed all aggregates prior to mixing during the period from August 10 to October 3 when it had a temporary washing method in use. Specifications required that a Navy inspector be present at the batching plant when concrete was being mixed in order to assure proper proportioning, but the Resident Officer had an inadequate staff and consequently an inspector was at Miller Company only occasionally. Had he been there consistently he should have been as well able as Hageman to determine whether the aggregate was clean or dirty.
22. On Saturday, September 3,1955, Hageman instructed the Miller Company by telephone not to supply any more concrete until hearing from the District Public Works Officer, and Miller Company said it would comply. The plaintiff’s labor force was not on the job from Saturday, Septem *456 ber 3, through. Labor Day, September 5. On September Y the defendant’s Resident Officer in Charge of Construction write the plaintiff as follows:
Substandard results of the tests of concrete placed at Klamath Falls Air Force Base have caused the Officer in Charge of Construction serious concern about concrete quality. I have been directed to advise you that the requirements for concrete strength and quality will be strictly enforced and that defective concrete will be replaced.
Random samples of aggregate from the batching plant in Klamath Falls indicate the dirtiest coarse aggregate in the experience of the District Public Works Office, Thirteenth Naval District. Clean aggregate is essential. Local Klamath Falls rock is excessively alkaline; pending further information on the characteristics of local rock, you are authorized to resume or to initiate, as the case may be, concrete operations for non-exposed work using clean local aggregate which complies with the specifications governing your contracts.
In view of the possibility that local rock may prove totally unacceptable for exposed work, it is suggested that you investigate alternate aggregate sources.
The Resident Officer sent similar letters to all other contractors performing contracts for the defendant at the airbase, since most of them were getting their concrete from Miller Company and some concrete failures had been experienced by the other contractors as well, but not as extensively as in the plaintiff’s case.
23. On September Y, 1955, at the instance of the Miller Company, the Northwest Testing Laboratory representative visited the Miller Company’s batching plant to observe the aggregate washing and handling equipment. After making an inspection and conducting a sieve analysis of the coarse and fine aggregates used there, Northwest reported that the aggregates tested for silt within specifications, and that the bins and hoppers were free from deleterious material.
24. On September 12, 1955, the plaintiff wrote as follows to the Resident Officer:
Reference is made to your Serial Letter No. 369 dated Y September 1955, stating that random samples of aggregate from the concrete batching plant “indicate the dirtiest coarse aggregate in the experience of the District *457 Public Works Office”. We understand that the sieve analysis of local coarse aggregate, on which this letter was based, showed a silt content of 1.25% as compared to an allowable silt content of 1% under Federal Specifications No. SS-A-281. A sieve analysis by Northwest Testing Laboratory of the Marysville, California and being used, copy of which we delivered to you on September 7, showed the silt content well within the limits of the above specifications.
Although you have stated that tests of concrete are causing serious concern, we have not been furnished copies of the laboratory reports, and our inquiries for the results of cylinder tests have not been complied with. To the best of our knowledge, the only low cylinders were on the first pours in July on the foundations for the Readiness Crew Building. The mix design in all cases was in accordance with Bureau of Yards and Docks Specification No. 13Yd, and a Navy Inspector was at the batching plant during the pours. The source of concrete and aggregate had been previously approved by your office.
In accordance with Article 5 of the Contract, you are advised that completion of work under the above contracts is being seriously delayed due to the stop order which you placed on pouring of concrete, as described below:
Without any notice to us, R. D. Miller Co., supplier of ready mixed concrete for these projects, was instructed by telephone from your office on Saturday, September 3, 1955, that he was not to deliver concrete on any Navy contracts until further notice.
This caused us serious additional expense, as we had set up to pour the first lane of the Alert Hangar floor starting at 6:00 A.M. on Tuesday, September 6, and brought in cement finishers from Portland and Medford for this pour. We had no knowledge of the fact we could not get concrete until 6:00 A.M. on Tuesday, when R. D. Miller Co. informed me.
Immediate measures were taken by R. D. Miller Co. to set up a better method of washing the coarse aggregate, and after the Northwest Laboratory report referred to above showed that the silt content of the coarse aggregate was well below the allowable 1% we were permitted to pour the first lane in the Alert Hangar on Thursday, September 8. However, we were directed by your letter not to pour any concrete that would be exposed to the weather until further notice. As of September 6, 1955, *458 all exterior steps and stairs were formed, ready to pour, on the Readiness, Post Exchange and Airmen’s Club Buildings. Until these are poured, we cannot proceed with grading and sidewalk work. If we had poured the first lane of the Alert Hangar floor on September Q, we would have poured the remainder of this floor in the four following days. We are stopped on this work because a portion of all remaining lanes are exposed to the weather. The remainder of the walls on the Ready Rocket Storage were ready to pour on Friday, September 9.
To date we have been unable to find ouh either from your office or the District Public Works Office in Seattle, wherein the concrete or aggregates being used do not meet the contract requirements.
The extent of these delays or the expenses involved cannot be determined at this time, but you are being notified in accordance with the contract. We will appreciate a decision at the very earliest date.
25. On September 14, 1955, the Resident Officer wrote to plaintiff in part as follows:
You are hereby advised that the coarse aggregate now being furnished for construction work at the Klamath Falls Air Force Base will not be acceptable for concrete placed in a horizontal plane and exposed to the application of water (either from the weather or from periodic washing down) and traffic or other continuous abrasive action of any sort. Such concrete would be included in parking aprons, runways, blast pads, taxiways, sidewalks, porches, building entrances, shower floors, galleys, garbage can enclosures, and the like. Another aggre§ate shall be furnished which meets the requirements of pecification 13Yd and demonstrates a satisfactory service record. This satisfactory service record may take the form of:
a. Satisfactory performance in exposed concrete pavement, sidewalks, or steps subject to traffic and the weather for at least five or
b. Use in pavements, sidewalks, or steps constructed for and accepted by an engineering agency of the U.S. Government or the State of Oregon involving satisfactory performance for not less than three years.
The coarse aggregate referred to in the letter as being unacceptable was that furnished by the Miller Company.
*459 26. On September 19,1955, the plaintiff informed the Resident Officer of the extra cost which would be entailed in securing concrete and aggregates from more distant suppliers, and concluded with the following notice:
Added costs, due to the delays incurred by this change of additional job overhead expenses, equipment rentals, form and accessory rentals, additional travel time and expenses of cement finishers, realignment of forms already in place ready to pour, winter protection and all other costs as a result of this delay will be submitted in a separate proposal when the extent of the delay can be determined.
In order to keep these expenses to a minimum and to complete the concrete work ahead of severe cold weather, it is essential you render a decision at the earliest date.
On receiving this letter the defendant directed Northwest to obtain samples from the suppliers named by the plaintiff, and this was done.
27. On or before September 23, at the request of the Resident Officer, samples of coarse and fine aggregates from various sources were submitted to and collected by Northwest Testing Laboratories for tests ordered by the defendant.
28. On September 22,1955, the Resident Officer wrote the following letter to the plaintiff:
Your letter of 19 September 1955, in reply to my letter #425 of 14 September 1955, is hereby acknowledged. These two letters concern the coarse aggregate used in concrete under the subject contract. Your firm takes exception to the requirement that aggregate shall have a record of satisfactory performance in existing concrete on the grounds that this requirement is in addition to the specifications of the subject contract.
During pre-design investigations in the Klamath Falls area all producing local sources of coarse aggregate were found to be located in weathered basaltic formations where the product of weathering is an alkaline reactive mineral. Highly selective quarrying would be necessary to meet a fundamental requirement of Section 2-05, NAYDOCKS Specification 13Yd, quoted herewith: “Coarse aggregate shall be free from water soluble alkali and from substances which might cause expansion in the concrete from reaction with alkali in the cement
My letter Serial #425 of 14 September 1955 invited your attention to the alternative requirement of Section *460 2-05, NAYDOCKS Specification 13Yd, quoted herewith:
“However, testing for these ingredients will not be required for coarse aggregate from a source which has been found free of these ingredients when tested previously or when satisfactory evidence is furnished showing that coarse aggregate from the same source has proven satisfactory in concrete of comparable proportions which has been subjected for a period of five years to essentially the same conditions of service and exposure as those in which the aggregate is to be used and in which the cement was similar to that to be used.”
In addition to the above and the other requirements set forth in NAYDOCKS Specification 13Yd for acceptable aggregate, there are specified requirements for an acceptable concrete as the ultimate material incorporated into the project. Obviously, the concrete can be no better than its components. Ergo, the ultimate mark of acceptance of the aggregate is acceptance of the concrete incorporating that aggregate.
It is to be noted that aggregates meeting all other physical requirements and found “free from water soluble alkali and from substances which might cause expansion in the concrete from reaction with alkali in the cement” are not required to also meet the requirement for a satisfactory 5-year “history”. Furnishing of an acceptable aggregate is the responsibility of the contractor, but designation of an acceptable aggregate source is not the responsibility of the Government.
In view of the fact that your letter of 19 September, re: Pending Change Item No. 3, is predicated on an alleged specification change which does not exist, no change in time or price for furnishing of an acceptable aggregate can be considered and no further action on your letter is necessary.
You are advised that the completion date of your contract is of vital concern to the Government as the facilities under construction are an important link in the defenses of the United States. In consequence, your immediate presentation of an aggregate complying in all respects with NAVDOCKS Specification 13Yd is essential. Further delays may well evolve into cause for assessment of liquidated damages.
29. Shortly after September 24, 1955, the plaintiff submitted to the defendant requests for partial payment for *461 the work done through September 24. These were paid on October 24,1955.
30. From September 28 to October 10,1955, the Northwest Testing Laboratories subjected each of 18 aggregate samples from six suppliers to seven separate tests to determine its characteristics, including durability, to comply with contract specifications. Cleanliness fer se was not specifically tested. This was the first time that the defendant had instructed Northwest to test aggregates. This was ordered by the defendant not just in connection with plaintiff’s contracts, but to determine the suitability of aggregates available from all suppliers in the area. By this time the defendant’s Kesident Officer was exasperated with all of the complaints over concrete and pressures of other suppliers and decided not to permit concrete work to resume until the concrete had been completely investigated. Testing of aggregates is not a common practice in concrete construction contracts, and is done only where there is some doubt as to useability of the material. It is usually done prior to placement of the concrete. Judging from the fact that the freeze and thaw tests alone take a minimum of 12 days, on a speedup basis, instead of a normal 30 days, it is concluded that the samples provided by the Miller Company and tested by the Northwest Testing Laboratories must have been provided prior to the time on October 3, 1955, when Miller Company installed its more efficient aggregate washing operation. This does not necessarily indicate, however, that the cleanliness of the samples provided by the Miller Company was typical of the aggregate which this company supplied the plaintiff prior to October 3. Northwest did a rush testing job at the specific urging of the defendant, since normally it would have taken 30 days to complete all tests. Except for the freeze and thaw tests, all of the other tests performed by Northwest from September 23 to October 10 could have been completed in seven days. The Kesident Officer had the right under the contracts and specifications to order these tests. He did not do so as early as May because he had no reason to suspect or anticipate concrete failures and did not want to spend Government money unnecessarily. He did not order the tests immediately upon learning on August 3 that dirty aggregate was the probable cause of the spalled concrete which then was discovered for *462 the first time, because be thought this might have been just an isolated bad batch of concrete which had been contaminated with dirt accidentally. Cleanliness of coarse aggregate itself could have been determined by a simple sieve test that could have been done in less than a day.
31. By October 3, 1955, Miller Company had placed in operation at its plant a permanent spray and conveyor belt aggregate washing machine and had cleaned out its aggregate bins. By this time the appearance of the aggregate had cleared up and improved.
32. The tests performed by Northwest on samples of coarse aggregate supplied by the Miller Company indicated that the coarse aggregate met specification requirements. On October 8, 1955, the defendant’s representative informed plaintiff orally that the Miller Company’s concrete was “released”. Pouring of concrete resumed on October 10. On October 11 the defendant confirmed in writing to the plaintiff the acceptability of Miller Company’s concrete in a letter reading in part as follows:
The contractor is advised that acceptance of the ingredients of the concrete does not constitute acceptance of the concrete incorporating these ingredients. Furthermore, acceptance of the aggregate samples indicated above does not precludes the necessity for continued tests to insure that the quality of aggregate is not changing significantly. These tests will be especially essential when the borderline aggregates are utilized.
The contractor is further advised that the ultimate acceptance of a concrete rests with the ability of the finished, in place product to meet the requirements of the contract.
33. From September 6 to October 10, 1955, plaintiff was barred by defendant from using any concrete from the Miller Company for any installation not protected from the weather, but was permitted to proceed with any inside concrete work which was not exposed to weather or to excessive washing with water. The injunction resulted in interruptions in varying degrees to the two contracts in suit, as partially indicated by the plaintiff’s letter of September 12 to the Resident Officer reported in full in finding 24, supra. Under Contract 879 the work was brought to a virtual standstill from September 15 to October 10, and the plaintiff was *463 ■unable to proceed at all with certain items such as steel erection which depended on placement of supporting concrete slabs. It is not believed that work under Contract 887 was hindered to the same degree as the other contract because there was considerable work under progress that did not involve concrete, but work under Contract 887 virtually ceased on October 3,1955.
34. From October 10,1955, to the onset of freezing weather in the first half on November, plaintiff was delayed in the progress of the contracts by its inability to get sufficient concrete delivered by Miller Company. Miller Company supplied concrete for most of the contracts being performed contemporaneously by plaintiff and other contractors at the airbase, and the defendant’s ban on the use of Miller Company’s concrete affected all of these contractors as well as the plaintiff. When Miller Company was again approved by the defendant as a source of concrete, on October 11, 1955, it was unable to meet accumulated demands for concrete by all of the contractors it had agreed to supply, and consequently it had to be rationed on a fair basis, resulting in short supplies to the plaintiff. Plaintiff made no effort until November 8 to procure concrete from other suppliers.
35. If there had been continuous placement of all concrete by plaintiff during the period from September 7 to October 10,1955, it is reasonable to conclude that plaintiff would have completed all concrete construction work under the contracts on or before October 31, 1955. The plaintiff’s inability to procure concrete for placement in exposed locations during the stated period, coupled with the period of several weeks following October 10 during which Miller Company rationed its concrete to the plaintiff and other Government contractors in order to meet the demands which the stop order had caused to accumulate, caused the plaintiff to defer much of its concrete placement until the onset of unusually severe winter weather. This in turn resulted in substantial work interruptions on many days of inclement weather, and attendant greater expenses. The parties have stipulated that plaintiff’s evidence, if produced,, would show that its damages amounted to $11,439.62, but there is no allocation of this between the delays attributable to the concrete shutdown *464 prior to October 10 and the concrete shortages subsequent to that date. No evidence on the amount of damages was offered by defendant. The contracts were eventually completed by plaintiff and accepted by the defendant, the latter issuing change orders for additional work which extended the times for performance to coincide with actual completion dates. Actual completion dates are not in the record. No liquidated damages were assessed the plaintiff under the provisions of the contracts permitting the assessment of liquidated damages for inexcusable delays.
36. Under date of August 14, 1956, plaintiff presented a claim against defendant requesting a change order for $14,930.98 alleging additional costs to it on account of the shutdown by defendant of concrete pouring between September 3 and October 11, 1955. The contracting officer denied the claim and change order on September 7, 1956. On November 7,1956, plaintiff duly filed with the Chief, Bureau of Yards and Docks, United States Navy, an appeal from the decision of the contracting officer. By letter dated February 6, 1957, the Chief of the Bureau of Yards and Docks denied plaintiff’s appeal from the contracting officer’s decision, and thereupon plaintiff duly filed an appeal to the Secretary of the Navy, which, on motion of the Government, was dismissed for lack of jurisdiction on July 26, 1957, by the Armed Services Board of Contract Appeals.
37. In November 1956 the Miller Company sued Drake Company in the Oregon courts for concrete it had supplied and not been paid for. In its response Drake Company pleaded that the concrete furnished by Miller Company did not meet Government contract specifications, and counterclaimed against the Miller Company for $35,515.46. In August 1957 the Oregon court found against Drake Company for $13,638.92, ruling that Drake Company had failed to prove that any concrete supplied by Miller Company, other than that poured on July 27, 28 and 29, 1955, was substandard, or that any breach by Miller Company had resulted proximately in delay to Drake Company. Drake Company thereupon filed objections to the special findings, citing as grounds that the evidence established that Miller Company had not only supplied substandard concrete in July but also *465 that on August 4, 5, and 12,1955, most of the building foundations were' defective on account of substandard concrete, and that Drake Company’s damages suffered in the performance of its Government contracts were directly attributable to Miller Company supplying substandard concrete that was not in accordance with Government contract specifications. The objections were not accepted and the Oregon court entered judgment for Miller Company against the Drake Company. Drake Company appealed to the Supreme Court of the State of Oregon, where the case is presumably still pending. In its brief to the Supreme Court of the State of Oregon the Drake Company asserted facts as to the substandard quality of the Miller Company’s concrete and the inadequacy of Miller Company’s temporary facilities for washing aggregates up to October 3, 1955, which facts, if true, would be completely inconsistent with the facts which plaintiff alleged and sought to prove in the instant proceeding before this Court.
CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States the amount of eleven thousand four hundred thirty-nine dollars and sixty-two cents ($11,439.62).